L. R. CONNETT & CO., Inc., v. THE REPUBLIC NO. 5 et al.

THE NO. 29.

THE REPUBLIC NO. 5.

THE GLORIA O.

District Court, S. D. New York.

Nov. 29, 1941.

246

Bigham, Englar, Jones & Houston, of New York City (Andrew J. McElhinney, of New York City, of counsel), for libellant.

Foley & Martin, of New York City (Christopher E. Heckman, of New York City, of counsel), for claimant.

CLANCY, District Judge.·

On September 21, 1938 and at about 3:-30 A. M., the scow "No. 29", bound for Arverne, and the scow "Jim" were taken in tow, tandem fashion, at the Gallagher Bros. Sand & Gravel Co. stakeboat No. 1 in upper New York Bay, near the Statue of Liberty by the tug "Republic No. 5". The "No. 29" bore about 900 tons of sand, so that its freeboard was 2 feet 4 inches at the bow, 7 inches midships, 12 inches aft and its draft was 9 feet. Its rail was 24 inches above the deck. The testimony that it was seaworthy is uncontradicted.

A light rain fell all that morning. The velocity of the north-northwest wind that was blowing was recorded at 4 A. M. as 13 miles per hour at Sandy Hook and 15 at the Battery and was undoubtedly less at the stakeboat. The tow proceeded down New York Bay without incident and when it was nearing Norton's Point the tug "Gloria O" came alongside and was instructed by the captain of the "Republic No. 5" to go outside Norton's Point and ascertain the extent of the ground swell which is an important factor in navigating eastward toward Rockaway Inlet. The "Gloria O" returned to report a heavy ground swell, a not uncommon sea condition there in all weathers, whereupon the captain of the "Republic No. 5" decided to tie up the scows at the seawall outside the mouth of Coney Island Creek. The tow was split with the tug "Gloria O" taking the scow "No. 29" and the "Republic No. 5" taking the scow "Jim". The "Jim" was tied up first off 27th Street and the tug's log reports it there at 7 A. M. The "No. 29" was moored a few minutes later

about 10 feet behind the "Jim". At 7 A. M. the Weather Bureau Station at Sandy Hook reported the wind to be north at 19 miles per hour while the one at the Battery recorded it at 15 miles per hour. Weather bureau reports show the increase in the wind's velocity since four o'clock had been so gradual as scarcely to be appreciable and we find it not excessive. The two tugs left 20 minutes later for Mill Basin to pick up some light barges. The wind gradually increased until, at about 11 A. M., when it was recorded at 22 miles per hour north at the Battery and 28 miles per hour at Sandy Hook. At approximately 11:30 A. M. the "Jim" broke loose and drifted up Coney Island Creek and within the following half hour the "No. 29" capsized. The capsizing was the result of the washing away, by the waves, of sand on the offshore side of the scow and a concomitant increasing inshore list.

Witnesses' estimates of the direction and velocity of the wind, even from those presented by the same litigant, were so much at variance that we find the Weather Bureau reports, which are translated throughout this opinion in terms of Daylight Saving Time on which the tugs operated, the only secure basis for our judgment. There was conflicting testimony whether or not South Brooklyn, north and northeast of the scene was low, and offered no break for the wind that was blowing, that the water north of the barges' mooring place was shallow in 1938 and that the mouth of Coney Island Creek is well protected from wind a short distance east of the position chosen by the tugs. We do not think any of these an important consideration in the decision.

■ The libellant had chartered its scow to Gallagher Bros. Sand & Gravel Co. Inc., and, although the true nature of its charter did not appear at the trial, it must necessarily have amounted to a demise. Bushey & Sons v. W. E. Hedger & Co., 2 Cir., 40 F.2d 417. Both the "Gloria O" and the "Republic No. 5" were chartered to the same company for towing services, the tugs being bound "to perform any towing services required" by the charterer. The masters and crews of the tugs were under instructions from their owner to take their orders from one Mr. Will, the charterer's dispatcher. We construe these as time charters. Leary v. U. S., 14 Wall. 607, 81 U.S. 607, 20 L.Ed. 756; Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co., 310 U.S. 268, at page 278, 60 S. Ct. 937, 84 L.Ed. 1197. It was Will who had directed the captain of the "Republic No. 5" to take the two scows from Stake No. 1 to Mill Basin and Arverne. Upon tying them up at the seawall, the captain of the "Republic No. 5" again called Mr. Will and told him he was unable to continue the voyage because of the heavy swell beyond Norton's Point. We do not recall that he gave further details and regard it as improbable in view of his testimony at the trial that conditions of comparative calm prevailed. He was told by Will to leave the boats there and Will further assigned each of the tugs a new task.

No witness questioned the safety of the berth given the "No. 29" at 7 o'clock and we find that it was then safe as a fact. The libellant argues, however, that the danger which later developed should then have been anticipated. We do not find this claim supported by the evidence.

■ No evidence was offered of any fact or any available information that would put the tugs on notice at half past 3 in the morning, when the voyage began, that a storm was approaching. The Battery, at that time, recorded a north wind of 15 miles an hour. True, a light rain was falling. It was September and a remote reference to the imminence of equinoctial storms was made on the trial but we are unable to impose a reasonable expectancy of equinoctial storms on any one day from a mere reference to that month. We can find nothing at all that should have deterred a prudent navigator from setting out on the voyage in the early morning and nothing transpiring between the start of the voyage and the tying up at the seawall at 7 o'clock that would have then warned him, as a reasonable man, to expect weather that would threaten the safety of the scows at the seawall later. There had been no considerable increase in the wind velocity nor any change in its direction. An expert witness who testified for the libellant said that a northeast storm is frequently accompanied by high winds but the records of the Weather Bureau at both Sandy Hook and the Battery disclosed that the wind never blew from the northeast on the 21st and for that reason the testimony of this expert, based as it was on an assumption that it did, is without value. No reason to expect a northeast wind has been submitted and in this connection we note that the Weather

Bureau reports which libellant put in evidence indicate that on September 18th the wind blew northeast all day with a degree of steadiness until the evening when a considerable decrease was noted; that on the 19th it blew with comparative gentleness from the southeast; that on the 20th it was practically steady from the north and had waned from a velocity of 13 at 5 o'clock in the morning to 4 at 5 o'clock in the afternoon. The barometer reading at 3 A. M. on the 21st was 29.70 and at 7 A. M. it was 29.65. A drop of this extent in a period of four hours is not unusual in New York waters and, even coupled with the rain and the 13 mile an hour wind at 7 o'clock, we regard it as no indication from which a more than doubling of the velocity of the wind was reasonably to be expected. For a few days before the barometer had fallen gradually but the maximum change did not exceed about .37 between September 18th and the morning of the 21st. The Weather Bureau at the Battery had received a bulletin at 5:25 A. M. informing it that a hurricane was then "225 miles south of Cape Hatteras and moving rapidly north or possibly slightly east of north. Indications are that center will pass near but slightly off Cape Hatteras within the next 12 hours. * * * Storm warnings are displayed north of Wilmington, to Atlantic City." It was not until 11:40 that instructions were received by the Battery and Sandy Hook stations to hoist northeast storm warnings north of Atlantic City and South of Block Island. A northeast storm warning was hoisted at the Battery upon the authority of the official in charge at 8 o'clock. How fallible this warning was appears from the fact that the wind never blew northeast all that day but quite to the contrary swung from north to southwest. If the Weather Bureau, with its vast experience and manifold sources of exact information apparently recognized no reason during the morning to expect the storm that transpired as a fact shortly before and after noon, we think it unfair to charge a tugboat captain with superior wisdom or different knowledge at seven o'clock. These conclusions derive support in the testimony of the bargee of the "Jim" who said he called Gallagher Bros.' starter between 11 and 11:20. He had coffee on his stove at eleven o'clock and then felt called upon to telephone the starter. At that time he said his barge was protecting the "No. 29"—from which we conclude its cargo was not washing off—and at 11:30

the "Jim" went adrift. The "Jim" lost a small portion of her cargo to the waves but just when he did not say. It would appear from this, and we find it as a fact, that the "No. 29" began to lose its cargo at 11:30. The wind, at that time, had reached a velocity of 37 miles an hour at the Battery and 34 miles an hour at Sandy Hook. This, of course, was the high wind that indicated the approach of the hurricane whose arrival in the neighborhood of New York was never promised by the bulletins received by the Weather Bureau until 3:15 in the afternoon when they were told it was 75 miles east—southeast of Atlantic City and moving rapidly north—northeastward. We are unable to find any fact or combination of facts in this evidence which, in our judgment, should impose upon these tug captains any reasonable expectation that a storm would arrive of the violence required to wash the cargo off the "No. 29" and then capsize it and we, therefore, acquit the tugs of any liability in tort for violation of their alleged duty to stand by their tow or to moor it at any other place than the one chosen. It is true that the captain of the "Gloria O" said that the breeze was from the northeast when he committed his boats to the seawall. We have found this an error in his recollection and if we felt compelled to accept it and for that to find him liable we would feel compelled also to accept his estimate of the wind's velocity which made it something less than a zephyr presenting no indication whatever of either an existing or an approaching storm.

The libellant pursues his argument, however, that after the bad weather developed the tug captain having failed to deliver the scow at the destination originally intended was under a continuing duty to return and care for it when bad weather actually arrived. But the tug's duty here was that fixed by the directions received pursuant to the charter and which it was obeying. The duty imposed upon a tug to return to its tow when the tow is menaced by bad weather arises where the tow has been left at an unauthorized point by a tug performing a towage contract. The Golden Rule, 1925, A.M.C. 297. We have shown how Will, the starter of Gallagher Bros., told the captain of the "Republic No. 5" to "leave the boats there and tow two of my other boats to another point." Objection was made to the admission of this statement in evidence but we think it is competent; it is clearly not hearsay, and

it is binding upon the libellant because it had chartered its scow to Gallagher Bros. and its cause of action, if any, is based on a breach of duty which, whatever it might be, arises out of and is fixed by the charter of the tug by Gallagher Bros. and any directions given pursuant to the charter. The testimony of this conversation with Will is uncontradicted and we think that Will's approval of the mooring at the seawall, coupled with the assignment to the tugs of other work, terminated the relationship of the tugs to the scow as their tow and constituted an accepted delivery of the scow to the one who had apparent authority to receive it. The Carlotta, 2 Cir., 48 F.2d 110. It follows that the tugs must be exonerated from liability for damages incurred later when the weather conditions changed. The Golden Rule, supra. The libellant argues that because there is no evidence that the tug captain fully informed the charterer of all the facts and conditions with respect to the berth, there could be no termination of the tugs' responsibility but we cannot agree. The tug captain does impliedly represent that the berth is a safe one under the existing conditions and those reasonably to be expected but does not represent its remaining safe for an indefinite period. When the dispatcher agreed to the mooring and gave new orders to the tugs, he accepted delivery at that point. There is no evidence that he was unfamiliar with the berth—his boats had been placed there before by these very tugs—and if we assume that he was, then his failure to inform himself of the character and conditions of the berth or to give his scow such care as changing conditions might require was at his own peril, as it ordinarily is. The Pansy, 1925 A.M.C. 937. If any negligence of the charterer can be established in permitting the scows to remain there when the berth was subsequently rendered unsafe, it may give the libellant a cause of action against it for failure to exercise that degree of care required of it by law.

Midway in the trial the libellant moved to bring in Gallagher Bros. Sand & Gravel Co., Inc., as respondent. The motion is denied. Suit against the Gallagher corporation, as charterer of the libellant's barge, was always open to the libellant. His motion now we regard as untimely and in any event we see no prejudice in its denial.

The libel is dismissed.