**POWELL & MINNOCK BRICK WORKS, INC., as owner of The SCOW P & M NO. 2, Libelant,**

v.

**The CALLANAN ROAD IMPROVEMENT COMPANY, Respondent.**

United States District Court
S. D. New York.

Nov. 1, 1962.

Macklin, Speer, Hanan & McKernan, New York City (Charles J. Carroll, Jr., New York City, of counsel), for libelant.

Budd, Quencer, Brown & Commette, New York City (Albert S. Commette, New York City, of counsel), for respondent.

WEINFELD, District Judge.

Libelant, the owner of the Scow P & M No. 2, seeks to recover damages caused to the scow while she was under charter to the respondent. The charter was the common demise charter which provided that the scow would have a captain furnished by the owner, and that the scow would be returned in the same condition as when received, less ordinary wear and tear.

The scow, which was open deck and of wooden construction, was engaged by the respondent to carry brick cargo. When fully loaded with bricks on deck from rail to rail (790 tons of bricks), it had about fourteen inches freeboard.

The scow was delivered to respondent on or about April 1, 1959 and was returned on August 2, 1959 in a sunken condition loaded with a cargo of brick. Since the scow was damaged while in its possession, the respondent, as the charterer, has the duty of going forward to explain the cause of the damage and to show that it was not due to negligent conduct on its part, and if it carries its burden in this respect then the libelant, upon the whole case, has the burden of proof to establish respondent's liability for the claimed damage.[1]

The respondent, in an effort to explain the occurrence, at least in part, contended that the scow was unseaworthy at the time of and prior to its delivery to it. However, the Court finds that the respondent has failed to sustain its position in this respect. The Court is satisfied that up to the day of the casualty the scow was seaworthy.

The scow had been repaired at a substantial cost immediately before its delivery to respondent on April 1, 1959. The scow captain and an officer of libelant both testified that it was then in substantially good condition. Thereafter, and up to July 23, 1959, while in the service of the respondent as charterer, the scow, on six different occasions, carried without mishap brick loads of 790 tons, the same load she carried on August 2, 1959, the critical date in this suit, and over the same course.

The respondent's contention that the scow was unseaworthy rested upon the testimony of an expert witness, who surveyed it some three weeks after it had been submerged. He testified that he then observed an opening or separation of planks three quarters of an inch wide, six or seven feet long, eight or nine inches below the deck line. He gave it as his opinion that this condition existed for months or even years before the scow was turned over to respondent, and was due to lack of caulking. However, this attempt to establish that the scow was unseaworthy prior to and during the period of the charter is unpersuasive, particularly in the light of extensive repairs made immediately before she was delivered to respondent. Moreover, the expert himself conceded that in his survey report made six weeks after the scow went under he took a contrary position— that is, up to the time of the sinking there was nothing wrong with it.

Thus, whether respondent has met its burden of explanation for the occurrence and, if so, whether upon the entire case libelant has carried the burden of persuasion that the respondent was negligent, must be determined by events surrounding the casualty.

On August 1, 1959 at 2:50 P.M., after the scow had been loaded with 790 tons of brick at libelant's yard at Coeymans, New York, she was taken in tow by the respondent's tug, the Callanan No. 1. In the tow were three other scows; the S & S No. 7, also loaded with brick, and the other two, light. The two loaded barges, that is, the P & M No. 2 and the

1. See In re Rice's Petition, 294 F.2d 272 (2d Cir., 1961).

S & S No. 7, were on the starboard side of the tow with the P & M in the aft position. The unloaded barges were on the port side, each abreast of the two loaded scows. Two hawsers ran from the tug to the S & S No. 7 and two hawsers ran from the S & S No. 7 to the P & M No. 2. The tow left Coeymans, which is a short distance south of Albany, and proceeded southerly down the Hudson River toward Kingston, New York, where respondent had a stone plant on Rondout Creek. The weather was fine and clear and the trip was uneventful.

At 3 A.M. on August 2nd the tow was landed at dolphins or spiles located south of Kingston, near the west shore of the Hudson River between Rondout Creek and Port Ewan. The dolphins were three in number and approximately five feet wide; they were about 600 feet from the shore line east of the mud flats and a short distance from Rondout Creek. The P & M No. 2 and the S & S No. 7 were landed inside the dolphins bow down the river. They were there positioned aft of another loaded scow, with the S & S in the middle and the P & M last with its stern up the river and to the north. The captains of the three scows made fast their lines. The P & M No. 2 had two hawsers running from her bow corners to the stern of the S & S No. 7. After the P & M No. 2 was made fast and secured, Clark, her captain, went to the cabin. The scow appeared to be in normal trim and Clark made no complaint to the tug either as to berth or condition of his scow. At this time there was nothing unusual about the weather or water.

Shortly after 3 A.M., the tug Callanan left the dolphins with the two light scows, which were landed at respondent's plant located on Rondout Creek. The tug there picked up six other scows loaded with stone and returned to the dolphins at 6 A. M., where they were placed offshore on the outside of the dolphins in two rows of three each. When so moored, there were in all three rows of three scows abreast of each other—one, including the P & M No. 2 which had been placed there at 3 A.M., and the ad-ditional two rows. This put the P & M No. 2 at the northwest corner of the nine scows in their tandem formation. The tug Callanan again left the dolphins at about 6:15 for other scows.

At 6 A.M. the wind was blowing out of the northeast. At about 6:45 A.M. Captain Clark came up on the deck; the wind was then blowing hard out of the northeast and waves were breaking over the port stern quarter with the bricks in that area absorbing the water. The scow was also taking water into the cabin, as well as into the port hatch which was then uncovered and was listing to port. At approximately 7 A.M. he started her pumps, but more water was coming in than could be pumped out; shortly thereafter the scow was in a heavy port list and in an effort to correct the list he threw bricks overboard, 700 (one-half unit) off the aft port corner and 700 off the midships port, but to no avail. The scow continued to founder. Finally, the port hawser was let go and Clark, for his own safety, jumped aboard the S & S No. 7. The P & M No. 2 started to swing toward the shore line.

At about 8:25 the tug Callanan No. 1 returned to the dolphins; by this time the P & M had swung to the shoreline, was aground on one side, and its bow was fast to the stern of the S & S No. 7 by only one hawser—that running from the starboard bow of the P & M No. 2, which was then cast off. The scow was pushed into the shoal water where she settled and sank.

■ After observing the witnesses, and upon the entire record, I am satisfied and find that the sole cause of the scow's foundering and sinking was the failure of her captain to keep the pumps in timely and proper operation while she was taking water.

The captain testified that when loaded to capacity, as she was on her last trip, the scow drew water over her decks quite freely and that the pumps had to be worked twice a night. On this occasion, however, he did not use his pumps at all during the trip down the Hudson.

When the scow was securely moored at the dolphins at 3 A.M., he went to his cabin and it was not until 6:45 A.M. that he reappeared, only to discover that a considerable amount of water had been taken in. The captain gave conflicting testimony as to his action or lack of action during that period—that is, from 3 A.M. to 6:45 A.M.

 I find that the pumps had not been put in operation until 7 A.M., sometime after the storm had come up. With the scow drawing water quite freely when fully loaded, the northeast wind was an aggravating factor. When Clark came out of the cabin shortly before 7 A.M., the port side was already heavily under water and, although the pumps were then put into action, it was too late—she had taken more water than the pumps could dispose of. In Clark's own words: "Just after 7 A.M. I started bilge pump with suction down stbd hatch but, with scow now in heavy port list, free water down below had all run over to port side." Since the master was the employee of the libelant, it must bear the burden of his negligent conduct in failing properly and timely to put the pumps in operation which, had it been done, would have prevented the P & M from sinking.[2]

 The libelant, in any event, seeks to hold respondent liable because the P & M No. 2 was moored at the dolphins instead of being taken directly to her ultimate destination in the New York harbor. However, I find no basis for so holding it. The P & M was moored there in a safe and customary manner. She was left in a safe anchorage. All the witnesses agreed that there was no adverse condition from 3 A.M. to 6 A.M. It is true that when the tug master returned to the dolphins with the six additional scows at 6 A.M. the wind started to blow from the northeast, but the situation was neither extraordinary nor dangerous at that time or thereafter. Although the captain of the P & M was not on deck, the tug master had the right to assume that in the event the storm became heavy, or because of other conditions which required that the pumps be put to work seasonably, the captain would in all respects properly attend to his barge. This he failed to do. The tug captain was not bound to anticipate that the bargee would not take the required precautions to protect his scow until it was too late.[3]

The case is to be distinguished upon the facts from Allied Chemical & Dye Corp v. Tug Christine Moran.[4] Here the barge was moored safely when the tug left at 6:15 A.M. and, although there was a northeast wind, there was nothing unusual which required her to stand by, nor any foreseeable danger which could not have been averted by the timely operation of the scow's pumps. The fact is that no condition subsequently arose which required the presence of the tug if the scow captain had performed his task. So, too, other cases cited by libelant are distinguishable upon their individual facts.

The respondent is entitled to a decree dismissing the libel.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.

2. See Lynch v. Agwilines, Inc., 184 F.2d 826 (2d Cir., 1950); Dailey v. Carroll, 248 F. 466 (2d Cir., 1917).

3. See The Sea King, 29 F.2d 5 (2d Cir., 1928).

4. 303 F.2d 197 (2d Cir., 1962).