**PACIFIC GAS AND ELECTRIC COMPANY, a corporation, Plaintiff,**

**v.**

**The STEAMSHIP LOMPOC, her tackle, apparel, engines and furniture, Pacific Coast Transport Co., a corporation, Western Ocean Transport Co., a corporation, Doe One, Doe Two and Doe Three, Defendants.**

No. 29231.

United States District Court
N. D. California.

March 22, 1968.

Findings of Fact and Conclusions of Law.

July 18, 1968.

768

Willard Gilson, San Francisco, Cal., for defendants.

W. Martin Tellegen, San Francisco, Cal., for plaintiff.

## MEMORANDUM

PECKHAM, District Judge.

On January 6, 1963, the Union Oil Tanker, SS LOMPOC, while maneuvering to moor at the Union Oil Dock in Humboldt Bay, California, lowered its port anchor in the Humboldt Bay Channel in such a fashion as to come into contact with and damage plaintiff's 10¾″ outside diameter gas transmission pipeline which crossed the Channel at a location some distance south of the Union Oil Dock.

This gas line had been installed pursuant to a Permit issued by the United States Corps of Engineers acting on behalf of the Secretary of the Army, dated September 6, 1960, as provided in Section 403 of Title 33 U.S.C. The issuance of the Permit was conditioned upon the completed pipeline fulfilling the specifications set forth in the application. The pertinent conditions were that the pipeline be laid at an elevation of at least 44 feet below the mean lower low water and that it be covered to a minimum depth of 5 feet. The actual installation occurred in October and November of 1961.

Plaintiff seeks damages for the reinstallation of the pipeline across Humboldt Bay. Parties agreed and the Court ordered that there be a bifurcation of the issue of liability and damages, and the trial held before this Court was solely on the issue of liability.

Plaintiffs contend that the Master and Pilot of the LOMPOC employed the vessel's port anchor in a negligent manner in maneuvering to moor at the Union Oil Dock and that this negligence was the sole cause of the damage to the pipeline.

Defendants contend that the conditions of the Army Engineers' Permit govern the location, elevation and cover of the pipeline and that Pacific Gas & Electric was at fault for failure to comply with the terms of its Permit. The Court finds that the acts and conduct of each side were contributing causes of the damage to the Pacific Gas & Electric pipeline and, therefore, that Pacific Gas & Electric shall recover one-half of its damages to be proved at a further trial.

The Master and Pilot of the LOMPOC sighted the signs on each bank of the channel and knew the location of the pipeline from these markings; nonetheless, the anchor was prematurely lowered by the Mate (who was not called as a witness) upon the order

of the Master. When the ship was moving toward the pipeline but was still a considerable distance south of it, the Master's order "to walk out" the anchor and the Mate's compliance were negligent conduct that directly contributed to the accident.

At the time of the fouling, a 215' to 230' portion of the pipeline was completely barren of any cover, and from the testimony of the experts concerning the presence of barnacles settled on the exposed pipeline, the Court finds that the pipeline was exposed in such a manner for a period of from five to eight months. This means that the pipeline was uncovered only a few months after its installation. The condition of the Permit requiring the five feet of cover requires not only its initial placement but its maintenance in this manner. Thus, the plaintiff was in violation of this essential condition which was included in the Permit to safeguard against obstruction of the channel and the particular kind of accident occurring here. Further the difficulty encountered in backfilling the pipeline indicated the necessity at least to provide a layer of rock or gravel, and this was not done by the plaintiff.

During the five to eight months when the pipeline was exposed without any cover, plaintiff did not inspect the pipeline to ascertain if the conditions required by the Permit were being fulfilled.

For these reasons the Court finds that the plaintiff did not comply with the conditions of the Permit and such failure to comply was a concurrent cause of the accident. The plaintiff had the burden to prove that its violation of the Permit condition not only did not but could not have contributed to the casualty. This burden has not been satisfactorily met.

Therefore, the Court finds both sides at fault and awards plaintiff one-half damages. The defendants do not seek damages.

The plaintiff is directed to prepare proposed findings, conclusions, and proposed judgment. The parties are to consult the Clerk for a mutually satisfactory date for a trial on the issue of damages.

This cause having come on for trial and the court, having heard and considered the evidence and the post-trial briefs of counsel, and having issued its Memorandum of Decision dated March 22, 1968, makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

1. At 0811 on January 5, 1963, the port anchor of the Steamship LOMPOC struck and damaged a 10¾″ outside diameter subaqueous gas transmission pipeline which crossed the Humboldt Bay channel at Eureka, California.

2. At the time of the casualty this pipeline was owned and operated by Pacific Gas & Electric Company (hereinafter referred to as PG&E), a corporation duly organized and existing under and by virtue of the laws of the State of California and was being used for the purpose of transmitting natural gas across the Humboldt Bay channel from Eureka to Samoa.

3. At the time of the casualty, defendant, Western Ocean Transport Co., a corporation, was the owner of the Steamship LOMPOC and defendant, Pacific Coast Transport Co., a corporation, was the operator of said vessel.

4. At about 0630 on January 5, 1963, the SS LOMPOC, under the command of Captain Willie Ashton Bodden, arrived outside Humboldt Bay bound for the Union Oil Company dock which is situated on the east side of the Humboldt Bay channel some distance northerly of the place where plaintiff's gas line crosses the channel. Captain Kent S. Castle, Jr., a duly licensed Humboldt Bay Bar Pilot, boarded the SS LOMPOC at 0710 for the purpose of assisting Captain Bodden in crossing over the bar into the Bay and proceeding up the Bay channel.

5. During all relevant times hereinafter mentioned the weather conditions were good with clear visibility.

6. Although Captain Bodden was somewhat familiar with the Humboldt Bay channel, having been the master of other vessels entering the Bay on previous occasions, he had not taken a vessel up the Humboldt Bay channel since plaintiff had completed the installation of its pipeline in November, 1961. As the vessel proceeded across the bar and in a northerly direction up the channel towards the Union Oil Dock and the site of the PG&E pipeline, Captain Castle informed Captain Bodden of the existence of the line and advised him that it crossed the channel between two points marked by a sign posted on each bank of the channel. Since the tide was expected to begin ebbing before the vessel could be moored, Captain Bodden and Captain Castle decided to moor at Union Oil Dock by approaching from the south rather than from the north. The use of one of the vessel's bow anchors was required to assist in performing the maneuvers necessary to moor from this direction.

7. Having decided to make use of one of the vessel's anchors in mooring the vessel, the mast and pilot discussed the necessity of exercising care in lowering the anchor so that it would not touch bottom south of plaintiff's new pipeline. Not only were Captain Bodden and Captain Castle aware of the location of plaintiff's pipeline clearly marked by signs which were clearly visible, but each knew that the pipeline, as installed, crossed the ship channel at an angle with the sign on the Samoa or westerly bank being situated southerly of the sign on the Eurkea or easterly bank. Measured at right angles from the course line of the channel, the sign on the westerly shore was located at a point some 690' south of the sign on the easterly bank.

8. The vessel's log reflects that at 0807, Captain Bodden ordered the Lompoc's port anchor "walked out" to one shot (90') either at the windlass or hause pipe, the log entry being somewhat unclear. The term "walkout" as used in the log means to lower the anchor under power of the winch rather than cutting it loose and letting it fall of its own weight. At the time that this order was issued Captain Bodden had retaken the conn of the vessel from Captain Castle after advising Captain Castle that he desired to handle the docking of the vessel. The log book reflects the loss of the port anchor (separation of anchor chain) at 0811, some four minutes later. Since the vessel was travelling at approximately 2 knots over the ground (approximately 200' per minute), and would have travelled approximately 800 feet during the interval between issuance of the order and loss of the anchor, it is evident that the Lompoc was some distance south of the PG&E line at the time Captain Bodden issued his anchor command.

9. The "walk out" anchor order was issued to the first mate of the Lompoc who was stationed on the forecastle head some 200' forward of Captain Bodden's station on the starboard wing of the bridge. Defendants failed to offer the testimony of this witness who had been charged by the master with the task of lowering the anchor in such a fashion as not to touch bottom south of the PG&E pipeline, and offered no explanation for failing to produce such an important witness. Under these circumstances, the court must infer that the testimony of the first mate would have been detrimental to defendants' contentions regarding the lowering of the anchor.

10. Based on all of the evidence and proper inferences to be drawn therefrom, the court finds that the master and first mate of the SS LOMPOC employed the vessel's port anchor in a negligent and careless manner in preparing to moor the Lompoc at the Union Oil Dock in that they caused the anchor to be lowered prematurely allowing it to touch bottom south of the PG&E pipeline, and to contact and damage said pipeline. In this connection the court also finds that there was adequate room north of the PG&E line in which they could have lowered the Lompoc anchor in maneuvering to moor at the Union Oil Dock.

11. When located by scuba diver, Kent Gildesgaard, the Lompoc anchor was lying just south of the PG&E line at a point where the line had been dislodged from its trench both vertically and horizontally. The court finds that the line was struck and damaged by the Lompoc anchor.

12. The court also finds that the negligence of the Master and First Mate of the Lompoc in prematurely lowering the vessel's anchor prior to passing over the PG&E line in such a fashion as to permit it to touch bottom south of the pipeline was a proximate cause of the casualty and the damage caused to said pipeline thereby.

13. Plaintiff's pipeline was installed in October and November of 1961. Since the laying of a submarine pipeline created an obstruction to the navigable capacity of Humboldt Bay within the meaning of 33 U.S.C. § 403 plaintiff was required to and did obtain from the Department of the Army, acting through its Corps of Engineers, a permit authorizing plaintiff to install the pipeline provided certain conditions were met. Amongst the relevant conditions imposed by the permit were the requirements that the pipeline be laid at an elevation of at least 44 feet below mean lower low water and that it be covered to a minimum depth of 5 feet between the pierhead lines.

14. As originally installed in November 1961, plaintiff's pipeline fulfilled the conditions of the U.S. Army Corps of Engineers permit. However, within five to eight months after the pipeline was installed it no longer met the requirement that it be covered with a minimum of five feet of backfill. Within this period of time portions of the pipe became completely barren of cover, permitting barnacles to attach themselves to its outer surface.

15. On January 5, 1963, when the Lompoc transitted Humboldt Bay, a 215′ to 230′ portion of the pipeline which crossed the main ship channel was exposed in its trench and barren of cover.

16. When backfilling the pipeline trench in November 1961, plaintiff found it difficult to keep in place the required amount of backfill near the center of the channel because the current in the area began eroding the backfill as soon as it was deposited. Plaintiff continued the backfilling operation, however, until soundings indicated that a sufficient amount of backfill was in place to meet the conditions of its permit.

17. The court finds that plaintiff's difficulty in achieving the required level of backfill should have indicated to it that the action of the current would soon remove the backfill cover from the pipeline unless precautions were taken.

18. Plaintiff could have prevented such erosion by digging a trench deeper than required by the permit or by using a top layer of rock or gravel as part of the required backfill.

19. Plaintiff did not inspect its pipeline or use other means to determine the amount of backfill covering its pipeline between the time the installation was complete and January 5, 1963, when the Lompoc's anchor fouled it.

20. Plaintiff was negligent in allowing its pipeline to become and remain exposed in its trench and in failing to maintain a minimum of five feet of backfill over its pipeline; this negligence was a violation of its permit which directly contributed to the casualty and was a proximate cause thereof.

## CONCLUSIONS OF LAW

1. The court has jurisdiction of the subject matter of this suit under the provisions of Title 28 U.S.C. § 1333 and the general maritime law.

2. The court finds that the casualty and the resulting damage to plaintiff's pipeline was the direct and proximate result of the equal and concurrent negligent conduct of plaintiff and defendants, and, accordingly, defendants are liable to plaintiff for one half of all damages which plaintiff sustained by reason of such casualty. The exact amount of the damages is to be determined in subsequent proceedings.

3. Each party to the action is to bear its own costs.

4. There shall be no interest on damages prior to the entry of final judgment.