**GULF OIL CORPORATION and Brown & Root, Inc.**

v.

**The TUG GULF EXPLORER et al.**

Civ. A. No. 69–1533.

United States District Court,
E. D. Louisiana,
New Orleans Division.

Dec. 13, 1971.

Robert B. Acomb, Jr., of Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., and Robert Eikel, of Eikel & Goller, Houston, Tex., for plaintiffs.

George A. Frilot, III, and E. Jack Green, Jr., of Lemle, Kelleher, Kohlmeyer, Matthews & Schumacher, New Orleans, La., for defendants.

MITCHELL, District Judge.

Gulf Oil Corporation, the owner of an 18-inch pipeline in the Gulf of Mexico, and Brown & Root, Inc., the owner and operator of the Derrick Barge FOSTER PARKER, which had been engaged in platform construction work for Gulf Oil Corporation, brought this suit for damages occasioned by the rupture of the pipeline.

The plaintiffs jointly sued Gulf Mississippi Marine Corporation, *in personam*, and its Tug GULF EXPLORER, *in rem.*

Gulf Mississippi Marine Corporation brought claims against both Gulf Oil Corporation and Brown & Root, Inc., claiming tort indemnity and tendering each plaintiff as defendant to the claims of the other.

This case was tried to the Court, sitting without a jury. After considering

the law and the evidence adduced at trial, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### 1.

Plaintiff, Gulf Oil Corporation (hereinafter referred to as "Gulf Oil"), a Pennsylvania corporation, was the owner of a submerged 18-inch pipeline running in a southerly direction from Gulf Refining Company's Bay Marchand pumping station, located on the coast of Louisiana, to Gulf Oil platforms located in Blocks 130 and 151, South Timbalier Area of the Gulf of Mexico. The pipeline ran through Block 124, South Timbalier Area, Gulf of Mexico.

### 2.

Plaintiff, Brown & Root, Inc. (hereinafter referred to as "Brown & Root"), a Texas corporation, was the owner and operator of the manned derrick barge FOSTER PARKER, a documented vessel of the United States of America, O.N. 500418, measuring 350 feet in length by 100 feet in breadth by 25 feet in depth. Although she was equipped with a compass, anemometer,[1] and several radios, she had no steering wheel or motive power of her own, and depended entirely on the tug to handle her navigation. She was equipped with seven anchors, six of which weighed 20,000 pounds each and were attached to 3,000 feet of 1½ inch steel cable. The seventh, a Baldt stockless or "storm anchor", weighed 16,000 pounds and was affixed to 1530 feet of 2⅝₁₆ inch anchor chain, which was raised and lowered by means of a winch positioned at the center of the bow of the barge.

### 3.

Gulf Mississippi Marine Corporation (hereinafter referred to as "Gulf Mississippi"), a Louisiana corporation, owned and operated the Tug GULF EX-PLORER, a steel hull seagoing model, measuring approximately 132 feet in length by 32 feet in breadth with a 15-foot draft. She was powered by two diesel marine engines which developed a total of 3600 h. p., and was equipped with AM and FM radios, a portable FM radio supplied by Brown & Root, and two Decca Model RM316 radar sets, which had no grid attachments.

### 4.

The derrick barge FOSTER PARKER had been engaged by Gulf Oil to work in connection with the construction of a Gulf Oil platform located in Block 134, South Timbalier Area, Gulf of Mexico. Through an intermediary known as a boat broker, the GULF EXPLORER was employed by Brown & Root to attend the FOSTER PARKER. There was no written contract, and the duties of the tug were those customarily undertaken with respect to similar operations in the Gulf of Mexico, i. e., to tow the FOSTER PARKER to a location pursuant to the orders and directives of her master or barge captain.[2]

### 5.

On March 7, 1968, the GULF EXPLORER towed the FOSTER PARKER to the location of the partially completed Gulf Oil platform in Block 134, where she was engaged in placing and driving piling. The barge had received weather reports from Brown & Root's shoreside office, predicting that the wind and seas in the vicinity of Block 134 were to increase during the evening of March 11 and morning of March 12;[3] the winds were expected to gradually shift from the southeast to the north or northwest. These predicted weather conditions were such that it was not expected that the FOSTER PARKER would be able to engage in any work activities at the job site.

During the morning hours of March 11, 1968, the wind and seas began to

---

1. Testimony of Robert Earl Nerrin, barge foreman for Brown & Root.

2. Testimony of Jerry Ledet, Captain of the Tug GULF EXPLORER.

3. See Exhibit, Brown & Root #5.

increase, and by noon the weather was such that the FOSTER PARKER was unable to continue construction operations.[4]

### 6.

At approximately 3:30 p. m.,[5] in accordance with orders from Brown & Root, the tug began towing the derrick barge toward the shallow, more protected waters of Block 29, South Timbalier Area, near the southern coast of Louisiana.

Before departing the work site, Brown & Root personnel placed a light on the partially completed platform to warn mariners of its presence.

Although the customary practice is to place a foghorn as well as a light on incompleted platforms in the Gulf, and although a foghorn was available on board the barge, none was placed on the platform before the barge departed the area.[6]

### 7.

Some time around 6:00 p. m., on March 11, 1968, as the flotilla was approximately six miles seaward of its destination, a crew change was effected in Block 47 when the BEN H. POWELL, a 100-foot radar-equipped crewboat owned by Brown & Root, came alongside the barge.

Although Captain Hendricks, the Master of the barge, went ashore, it appears from the testimony adduced at trial that although a new crew came aboard the barge, they were not to begin their duties until 5:30 the next morning. Meanwhile, the old crew would remain aboard working a twenty-four hour shift.

### 8.

Lester Courville, the new barge captain, came aboard to take over command of the FOSTER PARKER. The testimony reveals that notwithstanding the fact that Masters were sent to command the barge, the "real captain" was Brown & Root's shoreside personnel who would radio orders to the barge, which the crew would carry out.

Based upon orders given the barge by shoreside personnel prior to his arrival, Captain Courville ordered the tug to tow the FOSTER PARKER back toward the construction site despite the fact that the 50 to 60 foot water depth in Block 47 was substantially less than that in Block 134; the prevailing weather conditions were substantially less severe than those prevailing in Block 134; and the area was relatively free and clear of submerged pipelines, fixed platforms and other obstructions to navigation.

Although the standard practice in bad weather was to put into shallow waters,[7] the testimony revealed that the reason the barge was ordered back out into the Gulf was so the tug could watch over both the incompleted platform and the barge. Since no foghorn had been placed on the structure, the tug was required to patrol the worksite area and warn mariners of its presence and, at the same time, watch over the barge.[8]

No consideration was given to utilizing the BEN H. POWELL to patrol the construction site, nor was any consideration given to dispatching the tug to the site and leaving the FOSTER PARKER at anchorage in the more protected waters of Block 47.

### 9.

Before dropping anchor, the customary procedure was for barge personnel to look at pipeline charts located aboard the barge to determine if any pipelines were in the near vicinity.[9]

Captain Courville and Jack Garrett, the barge foreman, after reviewing charts aboard the barge and after considering the predicted weather and wind conditions, decided that Block 125 was

4. Testimony of Ralph Lee Rix, Project Engineer, Brown & Root.

5. Exhibit GM #9.

6. Testimony of Ralph Lee Rix.

7. Testimony of Robert Earl Nerrin.

8. Testimony of Ralph Lee Rix.

9. Testimony of Robert Earl Nerrin; Capt. Courville.

the best area in which to anchor the barge. Captain Courville retired at approximately 9:00 p. m., without giving any further instructions, and left Mr. Garrett in charge.

Shortly before midnight, and after checking his charts and radar,[10] Jerry Ledet, Master of the GULF EXPLORER, notified the barge that the flotilla was located in the approximate center of Block 125.

Upon orders from the barge, Captain Ledet towed the barge into the wind so she could drop her main anchor. Although the barge carried seven anchors, only her bow anchor was dropped.

### 10.

The towline of the tug was cast off and, as was the customary practice for a tug engaged to tow a derrick barge in the Gulf, she moved just astern of the barge in order to stand by during the period the barge was at anchor; however, Brown & Root personnel aboard the barge ordered the tug to proceed to the uncompleted Gulf Oil worksite in Block 134 for the purpose of patrolling the area and keeping a lookout for vessels which might possibly collide with the structure. Before complying with this directive, the tug captain warned the barge personnel that the tug could not keep a proper watch over the derrick barge from a position five miles distant and suggested that lookouts be posted to detect any drift of the barge should her anchor drag or her anchor chain part.

### 11.

On March 12, 1968, at approximately 1:00 a. m., the tug arrived at the worksite. Due to severe weather, it was impossible for the tug to anchor or tie up to the platform. She patrolled the area until approximately 6:00 a. m., during which time she was navigating in 15 to 20 foot seas and encountering high winds out of the west. A radar watch was maintained aboard the tug in order to detect ships in the vicinity. The derrick barge was observable as a blip on the radar screen, but as the tug moved through the patrol area, pitching and rolling in the seas, it was impossible to detect whether the FOSTER PARKER was drifting or dragging her anchor.

### 12.

When the tug departed the location of the FOSTER PARKER shortly after midnight, lookouts were posted aboard the derrick barge in accordance with customary practice while she was at anchor. Although a compass and C&GS Chart # 1116A was available at the lookout station, no one aboard the FOSTER PARKER recorded the bearings of the lights of nearby structures or took action to plot or record the barge's position. The Court finds that the weight of the credible evidence clearly demonstrates that during the night the anchor of the FOSTER PARKER dragged and she drifted to a location in Block 124.

James Wayne Norwood was on watch in the tower of the barge. He testified that after the barge dropped anchor, there was no movement and neither the seas nor the wind changed, yet the evidence reveals that the wind shifted from the Southeast to West, despite the forecast that the winds would shift to the North. Norwood stated unequivocally that he could see the tug positioned about a mile and a quarter to starboard of the derrick barge, yet every other fact witness verified that the tug was positioned four to five miles in the opposite direction.

The evidence reveals that while Norwood was on watch in the tower, he was on his second twelve-hour shift and, when he was relieved at 5:30 a. m. on March 12, he had not slept for twenty-four hours. The Court finds that Brown & Root failed to maintain a proper lookout aboard the barge FOSTER PARKER.

### 13.

At 5:30 a. m. on March 12, 1968, Robert Earl Nerrin, barge foreman, and his crew relieved Jack Garrett's crew.

10. Exhibit GM #10.

No one told Nerrin the location of the barge, nor did he ascertain its location.

At 6:00 a. m., Captain Courville awakened; saw that the winds were coming out of the West, and checked with the lookout in the tower to ascertain if the barge had drifted. After establishing radio contact with Captain Ledet, the latter informed Courville that the FOSTER PARKER was in the Southeast corner of Block 125. The tug was ordered to return to the site of the FOSTER PARKER and, about ten or fifteen minutes later, as she reached a position in close proximity to the barge, Captain Ledet determined that the barge had drifted during the night and was positioned in Block 124—some three miles eastward of the location at which she was initially anchored. Captain Courville was notified immediately.[11]

### 14.

Captain Courville ordered the tug, which had arrived on the scene at approximately 6:45 a. m.,[12] to attach its towline to the barge and, after several attempts in the heavy seas, the line was made fast to the bow of the FOSTER PARKER. Using an 800-foot towline, the tug was ordered to come ahead on its engines with sufficient power to ease the strain on the barge's anchor chain. Thereafter, Brown & Root personnel on the barge winched in the anchor chain until the FOSTER PARKER reached a point at which the chain led straight down or on a 90° angle from the bow. As the anchor was lifted from the bottom of the Gulf, the winch stopped for no apparent reason and could neither be lowered nor raised. The engineer on the derrick barge was summoned, but before he arrived on the scene at approximately 9:00 a. m.,[13] wave action caused the barge to rise and it became apparent that the pipeline parted when oil slicks appeared on the surface of the water. Captain Courville ordered the anchor lifted aboard the barge and directed the tug to proceed away from the oil slick as quickly as possible.

### 15.

Captain Jerry Ledet testified that he also told the barge that it was near a Gulf Oil pipeline.[14] Although pipeline charts aboard the FOSTER PARKER were not made available to the tug, Captain Ledet had worked on the job during which the pipeline was originally laid and was generally familiar with its original location. Although he was not called to testify, a Gulf Oil representative was aboard the barge during this entire operation. He certainly knew, or should have known, the actual location of the pipeline.

Nerrin, who was in charge of bringing in the anchor, testified that no one told him they were in the vicinity of a pipeline. Although the winch froze, no one thought to consult the pipeline charts, nor did anyone aboard the FOSTER PARKER make any effort to determine whether the anchor might be fouled on the pipeline, nor was any consideration given to buoying the anchor chain and leaving the anchor on the bottom.[15]

### 16.

The Court finds that certain acts and omissions of Gulf Oil played an important part in contributing to the casualty which damaged the pipeline. Although federal and state permits, pursuant to which the line was originally laid, provided that the line be buried three feet below the bottom of the Gulf,[16] the line when originally constructed, from the nine fathom curve seaward, was laid on top of the Gulf's bottom. Thus, that portion of the line in Block 124 was not buried as required by

11. Testimony of Robert Earl Nerrin.

12. GM Exhibit 9.

13. Ibid.

14. This was corroborated by testimony of Ronnie Ledet, Mate of the GULF EXPLORER.

15. Testimony of Captain Courville.

16. Exhibit GM #2.

the permits. The line was surveyed following Hurricane Hilda in 1964 and it was determined the line had moved westward. A second survey, made after Hurricane Betsy, revealed that it had moved farther westward, so in 1965, at the time of the last survey prior to this casualty, that portion of the line in Block 124 was positioned a distance of approximately 3,000 feet westward of its original location.[17] Whether it had moved farther westward since that time was not indicated by the evidence. The Court finds, however, that at the time of the casualty the line was located in the eastern portion of Block 124.

### 17.

The evidence further reflects that, at the time of the surveys following Hurricanes Hilda and Betsy, "scouring" had occurred, leaving the pipeline suspended horizontally so as to form an arresting barrier to objects such as the anchor of the FOSTER PARKER. During those surveys, various objects such as nets, a sizeable shrimp boat anchor, and other refuse were found entangled in the pipeline. Groupers had dug nests about three feet long and one foot deep under the field joints of the pipeline.[18]

### 18.

In 1965, Gulf Oil personnel recommended that, in view of the pipeline deviation, amended location plats should be filed with appropriate governmental agencies and lease holders of the Blocks through which the pipeline crossed, and that existing and all future pipelines he buried for their entire length.[19] However, nothing was done until after instant casualty, when the entire length of the pipeline was buried and its location recorded.

### 19.

The Court finds that plaintiffs have failed to prove, by a preponderance of the evidence, that either Gulf Mississippi or

the Tug GULF EXPLORER were guilty of any fault or neglect which proximately contributed to the pipeline damage sustained by Gulf Oil.

### 20.

From the evidence adduced at trial, the Court finds Brown & Root at fault for failing to place a foghorn on the platform before leaving the construction site; for having negligently ordered the flotilla back out into severe weather conditions and then ordering the tug away from the derrick barge; for having negligently failed to use more of its available anchoring systems; for having negligently failed to maintain a proper lookout; for having negligently failed to utilize available information as to the location of the pipeline; and for having negligently lifted the barge's anchor when Brown & Root knew, or should have known, that the anchor was fouled on the pipeline.

Further, the Court finds Gulf Oil at fault for having negligently failed to construct and maintain its pipeline in accordance with permits issued by federal and state authorities; for having negligently failed to notify those authorities that the pipeline had moved following Hurricanes Hilda and Betsy; and for having negligently failed to rectify the conditions which caused the pipeline to become an arresting barrier for the anchors of vessels lawfully using the waters of the Gulf of Mexico.

Finally, the Court finds that the combined negligence of Brown & Root and Gulf Oil approximately caused the damages occurring from this casualty.

### CONCLUSIONS OF LAW

### 1.

▆ This Court has jurisdiction of this action and venue is properly laid in the United States District Court for the Eastern District of Louisiana, New Orleans Division.

---

17. Exhibits GM #3 and GM #4.

18. Exhibit, GM #3.

19. Exhibit, GM #3.

### 2.

■ A tug is not the insurer of her tow. The obligation of those manning the tug was to exercise only such reasonable care and maritime skill as prudent navigators employ in performing similar services.[20]

### 3.

■ Where the tug and her tow are under separate crews, the tug has control over her tow only to the extent of carrying out the towage contract. The master and crew of the tow retain control over the tow in all other respects and determine what acts are to be done for the safety and direction of the tow in cases of emergency.[21]

### 4.

■ The Court concludes that the Tug GULF EXPLORER did not have exclusive control over its tow but only such control as was necessary to enable the tug and those in charge of the tug to fulfill the towage engagement.[22]

It is clear that the crew of the GULF EXPLORER had no authority over the master and crew of the FOSTER PARKER beyond such as was required to govern movement of the flotilla. In all other respects and for all other purposes the FOSTER PARKER and her crew remained under the authority of her barge master.

### 5.

■ Plaintiffs, Gulf Oil and Brown & Root, had the burden of proving by a preponderance of the evidence that defendant's negligence proximately caused damage to the pipeline.[23] From the evidence adduced at trial, the Court concludes that plaintiffs failed to carry this burden.

### 6.

Under the circumstances of this case, the tug was under a duty to locate the barge in Block 125, in a place free and clear of any obstructions. There is nothing in the record to indicate that Captain Ledet did otherwise.

### 7.

■ The Court also concludes from the evidence that plaintiffs have failed to prove that the tug was not equipped with proper and sufficient navigational equipment or was manned with personnel incompetent to fulfill the purpose for which she was hired.

### 8.

■ Under the implied contract of towage, the tug had the duty to properly locate and to stand by her tow while the latter was at anchor. At no time did the tug warrant that she could properly fulfill her duties while five miles distant from her tow.

■ Although plaintiffs expected the tug to watch over the barge as well as the platform, Captain Ledet warned plaintiffs that he was unable to properly observe the barge from the worksite, considering prevailing and predicted weather conditions. After locating the barge in Block 125 as he was ordered to do, and thereafter being ordered to move some five miles distant, Captain Ledet had the right to assume that, in the event the winds shifted or the barge drifted, the barge personnel would in all respects properly attend to the barge,[24] and would

**20.** Stevens v. White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699 (1932); Hart v. Blakemore, 410 F.2d 218 (CA5–1969); In re Moran Inland Waterways Corp., 320 F.Supp. 229 (S.D.N.Y.–1970).

**21.** Chitty v. M/V Valley Voyager, 284 F.Supp. 297 (E.D.La.–1968) aff'd, 408 F.2d 1354 (CA5–1969).

**22.** Connett & Co. v. The Republic No. 5, 43 F.Supp. 245 (S.D.N.Y.–1941).

**23.** Stevens v. White City, supra; Dixon Chemical Industries, Inc. v. Vincent C. Turecamo, Inc., 417 F.2d 619 (CA2–1969); Gulf Wave Towing Co. v. Mitchell, 176 F.Supp. 636 (E.D.La.–1959).

**24.** Powell & Minnock Brick Works, Inc. v. Callanan Rd. Imp. Co., 210 F.Supp. 114 (S.D.N.Y.–1962).

exercise ordinary care and skill under the circumstances.[25]

## 9.

 The tow is responsible for the "internal economy" of the vessel, e. g., the shifting of lines when moored or anchored.[26]

Although, generally speaking, a tug captain impliedly represents that the berth is a safe one under existing and reasonably expected conditions, he does not represent its remaining safe for an indefinite period.

When Brown & Root personnel sent the tug away from her tow, they accepted responsibility therefor. If the crew of the FOSTER PARKER were unfamiliar with her location, their failure to inform themselves or to give her such care as changing conditions might require was at their own peril.[27]

## 10.

The Court concludes that a proximate cause of the casualty was the failure of the FOSTER PARKER's personnel to look out for her own safety by failing to keep a proper lookout; by failing to use sufficient anchors for prevailing weather conditions; and in allowing the anchor to be raised when they knew, or should have known, that the anchor was fouled on the pipeline.[28]

## 11.

The Court concludes that Gulf Oil was negligent in failing to warn navigators of the current location of the pipeline.

## 12.

As the owner of a submarine pipeline, Gulf Oil was under a continuing duty to maintain the pipeline at least three feet below the water bottom in accordance with the permit issued to it by statutory authority. The Court concludes that Gulf Oil failed to meet the burden of showing that the violation of its permit could not have contributed to the accident.[29]

## 13.

Let judgment be entered in accordance with the above.

25. Wollaston, 62 F.Supp. 284 (S.D.N.Y.–1945) aff'd Martin Marine Transp. Co. v. Bermuda, 157 F.2d 431; Southgate v. Eastern Transp. Co., 21 F.2d 47 (CA4–1927).

26. Allied Chemical & Dye Corp. v. The Moran, 190 F.Supp. 703 (S.D.N.Y.–1961) Mod. 303 F.2d 197 (CA2–1962).

27. Connett & Co. v. The Republic No. 5, *supra*; The Pansy, 1925 AMC 937.

28. Crawford v. Indian Towing Company, 240 F.2d 308, 311 (CA5–1957), cert. den., 353 U.S. 958, 77 S.Ct. 865, 1 L.Ed. 2d 909 (1957); Petition of Marina Mercante Nicaraguense, S.A., 364 F.2d 118, 124 (CA2–1966); United States v. Westervelt, 135 F.Supp. 596 (S.D.N.Y. 1955); Pacific Gas and Electric Co. v. Steamship Lompoc, 291 F.Supp. 767 (ND Cal. 1968); Transcontinental Gas Pipe Line v. Mr. Charlie, 424 F.2d 684 (CA5–1970).

29. 33 U.S.C. § 403; 43 U.S.C. § 1333(f); Atlantic Pipeline Company v. Dredge Philadelphia, 247 F.Supp. 857, 861 (ED Pa.1965), aff'd 366 F.2d 780 (CA3–1966); Pacific Gas and Electric Company v. Steamship Lompoc, *supra*. United States v. Ray, 423 F.2d 16, 19 (CA5–1970).