Margaret CACHICK and Stanley Cachick

v.

UNITED STATES of America.

Jessie FLANIGAN and James M. Flanigan

v.

UNITED STATES of America.

Nina M. IMMELT and Fred Immelt

v.

UNITED STATES of America.

Lillian LAMBERT

v.

UNITED STATES of America.

Wanda F. LOVE and Walter S. Love

v.

UNITED STATES of America.

Jennie HEATON and Carl Heaton

v.

UNITED STATES of America.

Civ. Nos. 1967, 1986, 1990, 2001–2003.

United States District Court
S. D. Illinois, S. D.
April 16, 1958.

George J. Moran, Fred P. Schuman, Granite City, Ill., for plaintiffs.

Marks Alexander, Asst. U. S. Atty., Springfield, Ill., for defendant.

MERCER, District Judge.

On the 31st day of July, 1954 a public ceremony known as "Salute to the Depot" was held at the Granite City Depot Military Reservation, Granite City, Illinois, it being the 12th anniversary of the establishment of said Depot. The general public had been invited to attend and the event had received wide publicity. About three hundred people had attended a luncheon at the High School in Granite City which had concluded at about 1:30 o'clock p. m. The luncheon was followed by a parade from the High School to the Depot grounds. During the parade there was some cloudiness, some sunshine and some rain. The ceremonies in the reviewing stand, located on the military reservation, started about 2:30 o'clock p. m.

In order to accommodate those present at the ceremonies the defendant constructed certain stands for the seating of the people. One stand referred to in the evidence as a reviewing stand accommodated those who were to participate in the program and many guests and dignitaries who had been invited. Another stand had been constructed near the reviewing stand, this being referred to as the "ladies' stand". This stand was occupied exclusively by ladies, the ladies being the wives, friends and guests of the military personnel based at the Depot. The principal plaintiffs were occupants of the ladies' stand and it is admitted that they were invitees.

The evidence discloses that in respect to the construction of the ladies' stand that 3″ x 4″ stringers were used as supports for a roof constructed over bleachers and were ten feet six inches in height at the front and ten feet at the rear. The roof was higher at the front of the ladies' stand. All of the stringers were of the same height and the supporting posts were attached to the bleachers at ground level and the stands had not been imbedded in the ground in any manner. The weight of each section of the stand was computed by the Safety Director of defendant as 1,130 pounds and

the portion of roof of each section was 223.7 pounds and in the entire roof there was 1,083 square feet of yellow pine lumber. The ladies' stand consisted of four sections.

Shortly after the ceremonies began it started to rain and there was a moderate wind condition. After certain preliminaries Colonel Kurre started to speak, he being the principal speaker. The rain continued and a stronger wind was developing. The roof of the reviewing stand started cracking and it became apparent that a storm was about to strike. The Colonel had talked for approximately fifteen minutes and his speech was ended due to the weather condition. The people in the reviewing stand began to disband in all directions. In a very short period of time after the Colonel stopped speaking a violent storm crashed into the area and the roof upon the reviewing stand was blown upward and sailed through the air and the same gust of wind partially overturned the ladies' stand; two sections of said stand were overturned and two remained standing. Many of the ladies had left the ladies' stand but those remaining were in the ladies' stand at the time it blew over and certain of them alleged that they sustained injuries as a result of the overturning of the ladies' stand.

These proceedings were brought under the Federal Tort Claims Act and six cases have been consolidated and evidence heard only on the issue of liability.

We have involved herein the usual questions in negligence cases, namely, whether the plaintiffs were in the exercise of due care and caution for their own safety; whether the defendant was negligent and whether the negligence proximately caused the injuries complained of. Defendant has filed an affirmative defense "that if the plaintiffs received any injuries said injuries were caused by an act of God, unavoidable accident, and vis major".

On the question of plaintiffs' due care and caution it may be said that there is no rule of law which prescribes

any particular act to be done or omitted by a person who finds himself in a place of danger. A variety of circumstances constantly arise. The only requirement of the law is that the conduct of the person involved shall be consistent with what a person of ordinary prudence would do under like circumstances. The plaintiffs were invitees and were directed to sit in the ladies' stand. They had no knowledge of the method of construction of the ladies' stand and they were under no legal duty to inspect the stands. There was only one way to get in and to get out of the stands. It is true that when the rains started some of the ladies left, others stayed, and some moved toward the top to keep out of the rain. There is no evidence of any contributory negligence by the plaintiffs. The evidence discloses that the conduct of the plaintiffs was consistent with what a reasonably prudent person or persons would do under like or similar circumstances.

The next question involved is whether or not the defendant was negligent in failing to furnish to plaintiffs a reasonably safe place to sit during the ceremonies. Plaintiffs, in conformity with Rule 36 of the Federal Rules of Civil Procedure, 28 U.S.C.A., called upon the defendant to admit the following:

"That the stand on which plaintiffs were sitting at the time of the accident, was not attached to or imbedded in the ground in any manner."

The answer of defendant admitted the foregoing. In the defendant's brief is the following statement:

"Since it was not intended that the stand should be used in case of inclement weather, the personnel of the Depot did not take into consideration the possibility that the ladies' stand would be subject to winds of very high velocity."

The witness Fredericks was employed at the Depot as a Safety Director since 1951. He testified that the bleachers used in the ladies' stand had been purchased in 1944; that no roof had ever been placed over these bleachers before; that the stands were not designed or constructed to withstand any wind pressure but were only designed for the purpose of protecting the occupants from the sun. The witness also testified that he did not examine to see if the upright posts or supporting posts for the roof were in the ground.

The witness Wallis testified that he is a safety inspector for the State of Illinois and had been for the past nine years. He had constructed bleachers for outside events and was familiar with their construction and safety requirements, and further testified that the stands were not safe because they were not anchored and that proper construction for stands to be used by occupancy with the roof on it, as shown by plaintiffs' exhibits in evidence, was to have the sections of the bleachers firmly anchored to the ground by having concrete foundations and the sections anchored into same by bolts or to have the sections anchored by guy wires anchored in what is called a "deadman" which is either a concrete block or large wooden block stuck in the ground at a proper depth. He further testified that the way the stand was constructed violated safe construction practices in the area. He further testified that never in his experience had he seen a roof on a structure such as was on the ladies' stand that was not properly anchored.

The witness Goldenberg testified that he is a structural engineer, had examined the bleacher stands, had seen the exhibits pertaining to the ladies' stand, computed the measurements and weight, applied recognized engineering formulae, and it was his opinion that the stand would blow over under a turbulent wind of 45.3 miles per hour. It was his further opinion that for temporary use the stand would require forty 100 pound sacks of sand to be placed on the bottom braces of the stands to make them stable in a manner that would make them reasonably safe for occupancy.

Further evidence disclosed that the stand was not constructed from any plans.

■ The defendant was required to use reasonable care to guard against forces of nature which could have reasonably been foreseen.

Dr. Edward M. Brooks, an expert witness for the plaintiffs, is a graduate of Massachusetts Institute of Technology, connected with St. Louis University, and by profession is a Meteorologist. He examined plaintiffs' Exhibit 12 which was prepared by defendant's weather departments, which showed the forecast for the date of July 31, 1954. It was Dr. Brooks' opinion, based upon said report, that it could have been reasonably anticipated that thundershowers would occur in the Granite City, Illinois Depot area as predicted and further testified that if the thundershowers did occur as predicted and that the temperature reached 100 degrees as predicted, and that a sudden drop in temperature occurred as predicted, that the thundershowers would have to be accompanied by high winds. That the minimum and maximum winds that could be anticipated and expected would be from 30 m.p.h. for a minimum to 100 m.p.h. for a maximum, and that if there was a sustained wind of 30 m.p.h. the maximum peak gust of wind that could be expected would be 45 m.p.h. He further testified that the particular area involved was more susceptible to high winds and that the basis of his opinion was due to the fact that the Depot was located near the Mississippi River which intensifies moisture in the air and cuts down the friction of the wind. It was his further opinion that the velocity of the wind in the particular area involved had a sustained wind velocity between 39 and 46 m.p.h., and that by sustained wind he meant an average of five minutes and that the peak gust of wind could be 69–70 m.p.h. The type of wind that accompanies a thundershower is a turbulent wind, a turbulent wind being a wind in a vertical position moving in a continuous rolling motion with an updraft and downdraft effect. On this particular day the witness had charted the particular storm and noted its progress and described that it was moving from a northwest to a southeast direction and that it was first observed at 3:45 o'clock p.m., and that the storm hit the Depot area around 4:28 o'clock p. m. The witness, having examined plaintiffs' Exhibit 6 showing the ladies' stand with the roof overhead, was asked what effect, if any, a turbulent wind would have on this type of roof, stated that the wind would come underneath the roof and lift it like a sail. This witness further stated that wind speed could be easily ascertained and the storm easily forecast and that the storm could be observed three-quarters of an hour before it hit the Depot area. He further testified that this was a local storm and that it is common knowledge when you have a high temperature and thundershowers that a high wind accompanies the same. The witness further testified that 90 per cent of the time thundershowers accompany high temperature and that it is common knowledge that they most frequently occur in July and that in July in the area involved there is an average of nine days where high winds accompany thundershowers. He further testified that in computing the frequency of wind required to blow off the roof on the reviewing stand, considering its size and weight, that it would take a wind velocity of 34.2 miles per hour.

■ This testimony of Dr. Brooks is very persuasive and convinces the Court that the storm that occurred could have reasonably been foreseen and that the construction of the ladies' stand in the manner shown would not be reasonably safe for use and occupancy. It was the duty of the defendant therefor, to have used care in the construction of the stand in order to withstand the storm that occurred and in not doing so was negligent. That several witnesses testified that this type of storm was not unusual in the vicinity of Granite City, while others testified that it was an unusual storm. Be that as it may, the testi-

mony of Dr. Brooks is convincing. It may be said in passing that it was anticipated by those in charge of the ceremonies that there might be inclement and unfavorable weather conditions and in anticipation of such contingency had prepared and drawn up an alternate program to be used in case of inclement or unfavorable weather, the plan being known as Plan 6. I am convinced that the defendant simply made the wrong guess as to the weather conditions and in that decision committed an act of negligence. Since these forces of nature could have reasonably been foreseen, it appears to me that the defendant did not use reasonable care to guard against said forces of nature.

The defendant should have foreseen that under the loose and negligent manner in which the ladies' stand was constructed that it might be blown over by winds common in that section and community and do injury to those persons occupying the stands.

 The defendant relies in its affirmative defense upon the proposition of law that where a loss or injury is occasioned by natural causes such as could not be prevented by human skill and foresight, then the loss or injury is due to an act of God, vis major, or unavoidable accident, for which defendant is not liable. The mere fact that a high wind was blowing at and before the ladies' stand blew over did not make the blowing over of the stand an act of God so as to exempt the defendant from liability. A loss or injury is due to an act of God when it is occasioned exclusively by natural causes such as could not be prevented by human care, skill and foresight. The collapse of the ladies' stand was the result of the previous negligence in its construction which permitted it to be overthrown by a wind that was not unprecedented; at least it was the type of wind that could and does occur many times during the month of July in the community where the Depot was located. It is the opinion of the Court that there was an intervening human agency which contributed to cause the damage herein and as such the injuries were not caused by an act of God, vis major or unavoidable accident. This question has been aptly discussed in Blue v. St. Clair Country Club, 7 Ill.2d 359, 131 N.E.2d 31; Jacobs v. Hagenback Wallace Shows, 198 Mich. 73, 164 N.W. 548; Brewer v. United States, D.C., 108 F.Supp. 889; City of Chicago v. Smith, 95 Ill.App. 335; Sandy v. Lake Street El. Ry. Co., 235 Ill. 194, 85 N.E. 300; Wald v. Pittsburg, C., C. & St. L. Ry. Co., 162 Ill. 545, 44 N.E. 888, 35 L.R.A. 356; Berg v. New York Central R. R. Co., 391 Ill. 52, 62 N.E.2d 676; Merlo v. Public Service Company of Northern Illinois, 381 Ill. 300, 45 N.E.2d 665.

In conclusion I find that this action was properly brought under the Tort Act, 28 U.S.C.A. §§ 1346, 2671 et seq.; that the plaintiffs were not guilty of any contributory negligence; that the defendant was negligent in failing to properly construct the ladies' stand safely and securely in place so as not to be blown over by the windstorm of common and usual proportions in that community; and lastly, that the windstrom which was a natural force over which the defendant had no control was not the sole or proximate cause of injury but the injury was the result of negligence of the defendant.

It is the Order of the Court that the issues on the question of liability be found in favor of the plaintiffs and against the defendant. A judgment in conformity with this opinion should be prepared and presented to the Court. In compliance with Rule 52, Rules of Civil Procedure, the Findings of Fact and Conclusions of Law appear in this opinion and the same are adopted as a Findings of Fact and Conclusions of Law as contemplated by Rule 52.

It is further Ordered that a Pre-Trial conference concerning the issues of damage be set for May 28, 1958 at 10 o'clock a.m. in the Federal Court courtroom in Springfield, Illinois, at which time counsel shall be prepared to submit medical

reports, bills and all pertinent matters touching the question of damages. Any discovery procedure by either party should be resolved by that date. The conference will include all of the consolidated cases.