**UNITED STATES of America,**
**Libelant,**

v.

**POWELL BROS. BARGE NO. 128, her tackle, apparel, appurtenances, etc., and Powell Bros., Inc., Respondents.**

**POWELL BROS., INC., Original Respondent,**

v.

**MOTOR TUG SEMINOLE, in rem and George C. Clark, in personam, Respondent-Impleaded.**

**No. 64–109.**

United States District Court
S. D. Florida.

Dec. 29, 1965.

---

William A. Meadows, Jr., U. S. Atty., Miami, Fla., and Allen Van Emmerik, Admiralty & Shipping Section, Civil Division, Dept. of Justice, Washington, D. C., for libelant.

Richard F. Ralph, Miami, Fla., for respondent Powell Bros.

James L. Armstrong, of Smathers & Thompson, Miami, Fla., for respondents-impleaded.

MEHRTENS, District Judge.

This is an action for property damage to an aqueduct or water pipeline incurred by libelant, United States of America, as a result of a collision between respondent Powell Bros., Inc.'s barge and the aqueduct. The respondent's barge was never seized. Respondent impleaded the tug owner and operator, George C. Clark, and the tug "SEMINOLE." The cause came on for trial, and the Court, having considered the pleadings and the evidence, makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. Libelant, United States of America (USA), at all material times was and is a sovereign and the owner of a pipeline water aqueduct at Key Vaca Cut in the Florida Keys.

2. Respondent, Powell Bros., Inc. (Powell), was at all material times a corporation created and existing under the laws of the State of Florida and owner of a steel barge designated as No. 128.

3. Impleaded claimant-respondent, George C. Clark (Clark), at all material times was the sole owner and operator of the tug "SEMINOLE."

4. About September 9, 1960, Hurricane Donna passed through the Florida Keys, including the vicinity of Key Vaca Cut, causing extensive damage.

5. American Telephone & Telegraph Company arranged with Powell for carriage of telephone poles for hurricane restoration work from Jewfish Creek to

the vicinity of Marathon, Florida, which carriage was undertaken by Powell.

6. Powell's tugs were engaged in other operations and Powell contracted with Clark to tow Barge 128, which had a mobile crane on board, with Smith, one of Powell's employees, as crane operator.

7. Barge 128 was a bare steel barge 115 feet long, 32 feet wide, and without steering apparatus or motive power. The barge was not equipped with an anchor but was to be secured when not moored to land by means of a spud pole being placed through a spud well in the deck of the barge.

8. Smith's duties were to operate the crane in loading and unloading the telephone poles and, if directed by the captain of the tug, to use the crane in placing one of the telephone poles in the spud well.

9. Clark undertook the towage of the barge at an hourly rate from Powell's yard in the vicinity of Fort Lauderdale, Florida, to include loading at Jewfish Creek, delivery of the poles in the Lower Keys, and the return of the barge to Powell's yard, which involved navigation in the "inside" inland waters.

10. Prior to departing Powell's yard, Clark discussed with Harold Fisher, Yard Foreman Dispatcher of Powell, the fact that Barge 128 was not equipped with a steel spud pole. Fisher told him that there was no time to place a steel spud pole aboard the barge, and suggested to Clark that the telephone poles be used as spuds after they were taken aboard at Jewfish Creek. Clark apparently was satisfied that the telephone poles would operate satisfactorily as spuds.

11. Although steel spuds are customarily used when a barge is to be spudded rather than anchored, and are preferable to wooden spuds because of their greater weight and strength, the Court finds that under the circumstances it was reasonable to assume that the telephone poles would make adequate spuds.

The use of the wooden telephone poles and the failure to use steel spuds did not render the barge unseaworthy.

12. The "SEMINOLE" took Barge 128 in tow and proceeded to Jewfish Creek without incident. Upon arrival at Jewfish Creek, Smith directed Clark as to the location where he wished the barge placed in order that the poles could be readily loaded. The cargo of poles was taken aboard the barge and the three men, Clark, Smith, and an unnamed representative of American Telephone and Telegraph Company, left Jewfish Creek for Marathon, Florida, proceeding down the Inland Waterway. Hurricane Donna had destroyed most of the markers designating channels through which vessels might travel.

13. On or about September 15, 1960, the "SEMINOLE" arrived at Marathon with Barge 128 in tow. Clark went ashore, met and spoke with the Director of American Telephone and Telegraph Company hurricane repair and replacement work for the Florida Keys. That representative requested Clark to move Barge 128 to Vaca Key where the poles would be more readily accessible to the work to be performed by American Telephone and Telegraph Company. Clark requested approval to relocate the poles to Vaca Key from Douglas Gaines, Supervisor of Powell Bros.' operations in the Marathon area. Clark and Gaines proceeded to Vaca Key by land where they examined the site at which the telephone company had requested the poles be delivered.

14. Clark asked Gaines whether the water in the cut through which the barge and tug would have to approach the spot designated by the telephone company representative was of adequate depth for the tug and barge, as Hurricane Donna had destroyed the channel markers. Gaines assured Clark that the water was deep enough and mentioned that the tug "BOB WHITE," known to Clark to be a vessel of greater draft than that of the "SEMINOLE," had successfully proceeded through the channel to be used.

15. Clark returned to the tug, again took Barge 128 in tow, and proceeded to Vaca Cut. At approximately 10:00 A.M. on September 16, 1960, while proceeding through Vaca Cut, Barge 128 ran aground on a sand bar. Despite the fact that Clark was using charts which showed the waters through which he was navigating to be of adequate depth, the barge went aground on an unmarked bar apparently created by Hurricane Donna. Several attempts to remove the barge were unsuccessfully made. High tide came between 12:00 and 1:00 P.M. on September 16, at which time further efforts to remove the barge were made by Clark with the tug "SEMINOLE." Those efforts were unsuccessful. A second attempt to extricate Barge 128 was made at the next high tide between approximately 12:00 and 1:00 A.M. in the morning of September 17. That attempt was also unsuccessful. All efforts available to Clark under the circumstances were made to extricate the barge between the time she first went aground and the time high tide subsided early in the morning of September 17, 1960.

16. Clark decided that the barge could not be extricated solely by the tug "SEMINOLE" and that an additional tug would be required to remove her into deeper water. Accordingly, he determined to leave the vicinity and to obtain assistance from the tug "SNIPE," which he had observed at Marathon the previous day. The barge was secured only by dropping a wooden telephone pole through the spud well. Smith left the barge with Clark, to go ashore.

17. Clark left Vaca Key by Army bus at or about daybreak the morning of September 17. Clark realized that the next high tide would come at approximately 12:00 to 1:00 P.M. on September 17, and he planned to have the tug "SNIPE" and its Captain back to Barge 128 at that time, to assist him with the "SEMINOLE" in re-floating Barge 128. Clark's trip from Vaca Cut to Marathon took less than one hour.

18. On arriving at Marathon, Clark learned that the crew of the tug "SNIPE" had left the Key and returned to Miami. Clark explained the situation to Gaines and received permission to take the tug "SNIPE" back to Barge 128 as the "SNIPE" was a larger tug with greater power than that of the "SEMINOLE." Upon Clark's arrival at Vaca Cut at approximately 1:00 P.M. September 17, aboard the tug "SNIPE," he found that Barge 128 had gone adrift and had struck the aqueduct, doing damage thereto.

19. Smith was not aboard the barge when it went adrift and was carried from the sand bar into the aqueduct.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties to and the subject matter of this admiralty cause.

2. Clark and the tug "SEMINOLE" undertook a contract of towage of the Barge 128 with Powell.

3. The tug accepted the responsibility for the tow as soon as it took the tow from Fort Lauderdale. This responsibility was a continuing one which would not have terminated until the tow was safely anchored at the completion of the voyage. See The Bartle Daly, 45 F. 2d 605 (2 Cir. 1930); Allied Chemical and Dye Corp. v. The Christine Moran, 190 F.Supp. 703 (S.D.N.Y.1961).

4. The Court finds that Clark was negligent in that after the tug had run aground he should not have abandoned it without securing the barge in a more adequate fashion. Under the existing conditions, including the exposed location, the hard bottom, changing tides, and rapid currents, it was foreseeable that unless the barge was adequately secured it could go adrift. It was the tug's duty to properly secure the barge before abandoning it. When a tug finds that she cannot deliver her tow at the intend-

ed destination, it is her duty to tie the tow adequately and protect it. See The Bartle Daly, supra; Allied Chemical and Dye Corp. v. The Christine Moran, supra.

5. Clark's negligence was the sole proximate cause of the damage to the libelant's aqueduct.

6. As stated previously, Smith was along on the voyage solely as a crane operator. He had no duties with respect to securing the barge. Assuming, however, that Smith could be considered to be a bargee, the Court concludes that nevertheless the tug and not the bargee must assume the responsibility of properly securing the tow prior to its delivery at the intended destination. Allied Chemical and Dye Corp. v. The Christine Moran, supra. The tug could not delegate this responsibility to Powell through Smith.

7. Being of the opinion that the wooden telephone poles were adequate to operate as spuds, the Court concludes that the barge was not unseaworthy. Even assuming *arguendo,* however, that the barge should have been equipped with a steel spud, the record is void of any evidence that would indicate that had a steel spud been set, the barge would not have gone adrift. Therefore, it cannot be concluded that the failure to equip the barge with a steel spud was a proximate cause of the collision.

8. The libelant having instituted this cause solely against Powell in personam, and the Court having concluded that Powell is without fault, the libel will be dismissed. The impleading libel against the tug being one for indemnification will likewise be dismissed. Both the respondent and the impleaded respondent shall recover their costs from the libelant.

9. Counsel for the parties shall submit a final decree in accordance with these findings and conclusions within fifteen (15) days.