In re Exoneration from or Limitation of Liability as to TUG "SEA HAWK"

v.

SOCOCO, LTD., et al., Underwriters at Lloyds, et al., and Port Everglades Ship Sales & Charterers, Inc., et al.

SOCOCO LTD., et al.,

v.

STERLING MARITIME CO., LTD., etc., et al., Powell Brothers, Inc., etc., and Port Everglades Ship Sales & Charterers, Inc., et al.

Nos. 81–6396, 81–6507–CIV.

United States District Court,
S.D. Florida,
Fort Lauderdale Division.

Aug. 4, 1988.

G. Morton Good, Smathers & Thompson, Miami, Fla. and Armstrong & Mejer, Coral Gables, Fla., for plaintiffs.

Carl W. Taylor, Fort Lauderdale, Andrew I. Waks, and William B. Milliken, Miami, Fla., for defendants.

## FINAL ORDER

ROETTGER, District Judge.

Port Everglades, acting as a broker in this regard between the barge charterer and cargo carrier, engaged Powell Brothers to tow the barge which was carrying cargo from Fort Pierce, Florida to Colombia. They chartered Powell Brothers after the intended tow TOUGH BRIO was unavailable and the SEA HAWK was the tug chosen to make the tow; original plans were to leave the barge at the sea buoy at Key West where the tug KAHUNA would take the barge in tow and complete the tow to Colombia.

Plans were then changed. At the instructions of Mr. Campbell of Port Ever-glades charter, the SEA HAWK towed the CHALMED #1 from Fort Lauderdale to Fort Pierce where it was loaded with its cargo. Then the SEA HAWK returned to Fort Lauderdale and went back to Fort Pierce after the barge had been loaded and took the barge in tow, with the new destination being Ocean Cay in the Bahamas.

Ocean Cay is essentially a man-made island owned by Marcona; Marcona was mining aragonite and various other materials for use in the construction trade, mining out of the sea bottom. Marcona had a channel and some facilities at Ocean Cay, including a dock with one extremely large ocean-going bulk carrier named the MARCONA CONVEYOR. It was not there at the time in question but the MARCONA CONVEYOR (registry of about 72,000 tons, 890 feet long with a beam of 104 feet), was large enough to require a large dock area there for loading. However, a smaller ship was tied up there at the time. That was the only area available for large ships to tie up and Marcona usually permitted no one else to tie up there because it could interfere with its barges moving in from the mining area to offload on the island.

The tow was to be met at Ocean Cay by the seagoing tug KAHUNA, a tug about one hundred feet long; KAHUNA was then to complete the tow to Colombia.

The barge itself was the CHALMED #1 built in 1904 in Honduras of gross tons 2,674, with an overall length of 350 feet, a draft of about nine feet and a beam of 56 feet. It was originally built as a Great Lakes steamship, and therefore doesn't have the usual configuration of a barge but that of a ship.

The tow (CHALMED #1) was en route with the tug SEA HAWK, from Fort Pierce to Ocean Cay on March 14, 1981; then Campbell, of Port Everglades Charterer, advised Powell Brothers that the relieving tug, KAHUNA, had mechanical difficulties so the transfer would be delayed. A discussion took place between Campbell and Casey, the operations manager of Powell Brothers, about how to handle that situa-

tion, because a number of options were presented.

The tug SEA HAWK could stay with the barge or it could leave the barge at Ocean Cay. For the SEA HAWK to stay with the barge, the fee would be an hourly fee adding up to $1600 a day plus fuel; Campbell, the charterer, did not want to incur that expense.

At that point, upon inquiry by Campbell, Ferland's name was suggested as a possible watchman for the barge, and the tow continued towards Ocean Cay.

## TUG AND ITS CREW

An examination of the backgrounds and skills of the tug captain and the crew shows: tug captain was Ramon Martin, the engineer was Donahue, and Dahliden was aboard as well. And there were two crew members in addition to Martin for the barge.

Martin had never before made an ocean tow this large and had never anchored a barge of this size previously.

Actually, Donahue's qualifications were better than Martin's. Donahue was the mate and the second captain. Powell Brothers had a practice of having a first captain plus have a mate serve as a second captain. Martin had been the second captain and when the first captain left, he became the first captain of the SEA HAWK.

The crew's size was adequate and they were qualified; the qualifications of Martin at least appear to be adequate for the task, despite his lack of prior experience with a barge of this size. That is not going to be the critical factor in the case.

There was no training program for barge captains or personnel at Powell Brothers and no standing orders. Casey's testimony was that when Powell hires somebody, Powell assumes they have the qualifications if they have the requisite background and licenses. Martin did have the 200 mile towing license; Martin had been with Powell Brothers three months.

## ARRIVAL AT OCEAN CAY

At Ocean Cay the tow arrived at the sea buoy at 5:15 and called Marcona as Campbell instructed them to do.

Casey and Campbell previously had agreed to an anchorage on the east side of the island, which was the more protected side. The west, southwest, and northwest sides of the island were closer to the Gulf-stream and closer, therefore, to the winds coming out of the northwest at that time of year, which would be the more severe fronts.

The northeast side of the island was the location of Marcona's mining operation and Marcona did not permit any anchorage there.

A turning basin lay to the south side of the island, but it was necessary to enter the channel from the west and the channel ran basically easterly from the Gulfstream. One progressed easterly past the buoy, past the loading pier on the south side of Ocean Cay, with the turning basin being on the starboard hand, and then to the easterly side of the island for the desired anchorage.

There was much dispute about what happened when the tow arrived at Ocean Cay. The person at Marcona, who was on the radio to the tug, did not testify even by deposition. Coburn, his counterpart at Marcona, was walking in and out and heard some aspects of one side of the conversation, and testified in his deposition that they (SEA HAWK) should stay on the string, which means keep the barge in tow, because a front was due in within the next 24 hours from the northwest, a fast moving front across Florida; further he indicated that there were no instructions about the site of the anchorage—at least, he heard none.

## CHOOSING OF THE ANCHORAGE SITE

Testimony of the captain of the SEA HAWK was that he was to call Marcona per Campbell's directions and do what they said.

One of the unequivocal bits of evidence in the case is that Marcona permitted no anchorage in their channel or in their turning basin or anything that would interfere with their mining operations.

Three witnesses, Martin, Dahliden and Donahue, testified that two Marcona tugs came out, although one was a line-handling boat. There were three Marcona tugs at Ocean Cay at the time. One boat, the Spencer, took the papers as to the tow, and there was also a smaller vessel.

Martin said that one Marcona vessel indicated the spot of anchorage, which was southwest from the island, south of the channel at about the second buoy, and that location was where he anchored the barge.

Because of the fact the court has three witnesses' unequivocal testimony that two Marcona boats came out and Dahliden even noticed the house flag logo on the stack contrasted with Coburn's testimony by deposition that only one boat went out and the fact that Coburn on Marcona was wandering in and out and only heard occasional snatches of the conversation—the court accepts as more credible the corroborated evidence that more than one Marcona boat came out.

There would be little reason for more than one boat to come out unless the story was as Captain Martin indicated. Therefore, it appears to the court that the anchorage area, although not the exact site, was indicated by Marcona and that Martin followed their instructions.

There are a number of additional reasons why the court came to that conclusion. An enumeration of them is appropriate:

One, Martin knew the anchorage was to be on the east side of the island because that's what Casey, his operations manager, had told him.

Two, Martin reinforced his conclusion that the better anchorage was on the east side of the island by examination of the charts en route from Fort Pierce to Ocean Cay.

This leads the court to the next step: Why change the site for anchoring? There had to be some intervening force or else there'd been a flip-flop in Martin's thinking. The only thing that really makes sense is that Marcona's instructions were the intervening force.

Anchoring at Ocean Cay is not like anchoring in international waters. Marcona is the host; it's their island and you follow their instructions because the SEA HAWK was a guest of Marcona. And rather clearly from the evidence, Marcona wasn't all that thrilled about having anyone anchor there—although apparently from time to time other barges were left there. However, Marcona was extremely careful about what they permitted, although occasionally they permitted anchorage on the east side of the island as well.

An additional factor was Casey advised Campbell that the SEA HAWK was arriving back in Fort Lauderdale on Sunday but said nothing about the anchorage site. Without anything else, that could cut a number of different ways. However, with all of the other factors the court has to conclude that it is additional corroboration for Marcona's picking the area because Casey's conversation with Martin after the anchoring, although not spelled out in detail, indicates that he believed Martin had followed the orders from Marcona.

Therefore, the court finds that the generally southwest anchorage area was selected by Marcona.

### ANCHORING

The barge CHALMED #1 had its own anchor, although it was a stockless anchor, and that is a factor for the captain of the tug to consider because stockless anchors don't anchor as well as stocked anchors, because it's easier to dislodge the flukes of the stockless anchor.

Aragonite is not as good a bottom surface to anchor in as would be many other sea bottoms. E.g., aragonite is not as good as sand, sand is not as good as mud, and mud is not as good as clay.

The anchorage operation took place in twilight. We have had the benefit of trying this case exactly on the same days of the week as well as on the anchoring anni-

versary; in fact, we finished the trial on the anniversary of the day the barge went aground. It was getting rather dark that day because it is sundown at 6:45 or so this time of year. Twilight is short in the subtropics.

Captain Stow criticizes the fact that longer time was not taken for the operation. Donahue, the mate, says it doesn't take long to tell whether the anchor is set; and he describes the operation as about ten minutes. Martin indicates he took bearings and everything was all set. According to Dahliden, the barge "set real well." And both Dahliden and Martin indicated they backed down about 15 minutes to test the anchorage.

The actual position of anchorage is fairly well fixed from the evidence. Both Ferland's estimate and Coburn's estimate place it basically south of the second buoy on the channel; and the site is corroborated by Dahliden as well.

### DEPTH OF WATER

The depth of the water, of course, is a critical factor for computation of scope and the length of chain that should be payed out.

The evidence on the depth of water ranges from ten to 15 feet by Martin, to as much as 50 feet. The chart indicates it's about 8.6 meters, slightly over 28 feet. By Coburn's estimate it was about 25 to 30 feet there. At one other time, Martin indicates 30 feet.

Coburn's seems to be the most accurate credible evidence, corroborated by the chart, placing the depth there at about 28 feet. And the court is not unmindful of Captain Stow's observation that charts are inaccurate there. Although we operated in this trial with a chart that was prepared subsequent to the time of the grounding, there was neither objection by counsel nor any variance demonstrated by the evidence.

The only estimate before the court of the height of the lip of the hawse pipe above the surface of the water is 10 to 12 feet. Therefore, the court must presume that the distance from the hawse pipe to the bottom of the ocean runs between 38 and 40 feet. Simply for ease of mathematical computation, 40 feet will be used as the vertical length on the formula for scope.

### LENGTH OF THE CHAIN ESTIMATES

Unfortunately, they are all estimates. The court has two surveys, but one of them says 70 feet and one of them says 200 feet—indicative of the conflicting evidence in this case. Both surveys were made after the barge grounded.

Dahliden says the anchor chain paid out so slowly that he was easily able to count the links, and there were between 240 and 260 links which he concluded meant there were 250 feet of chain let out. He confirms his conclusion because when Powell Brothers returned after the grounding of the barge on the salvage operation, that he checked it out and there was about 250 feet out.

When one examines the pictures, it looks as if the amount of chain out is on the short side, because one can see what appears to be the anchor under the water, and can also see what appears to be the chain. However, it is impossible to tell from the photographs whether the chain is taut, coiled or snaked along on the bottom.

Campbell's estimate that it was about 50 to 60 feet deep, with only 50 to 60 feet of anchor chain out is simply not credible. The barge would have gone aground long before Friday if the anchor chain had been vertical and the anchor were merely bouncing on the bottom. Plus, that would be completely contrary to the scope angle as testified to by Ferland, Coburn and a number of disinterested witnesses in this case.[1]

---

1. The court has some evidence—exclusively from Mr. Campbell—that the links are seven inches net and were ten inches overall. And so, except for the last chain link, the bitter end, where you would get the ten inch increment, all the other links of the chain would net out at seven inches in length. This results in a formula of seven n plus ten equal the total length of the chain in inches, n being the number of links. This calculation, based on two hundred fifty links payed out would result in a length in the one hundred fifty feet range of chain.

The court must conclude that the chain length that was out was 200 feet.

The court has opted for a finding of 200 for various reasons, including one survey after the grounding. So consequently we end up with a scope of almost exactly five to one, which is the lower end of the safe range of scope for anchoring. The testimony was uncontradicted throughout that a five to seven scope was the safe range.

There were certain factors involved here that would make one tend to think that a longer scope, nearer seven, would have been preferable because of the aragonite bottom, the stockless anchor, with all of the shearing propensities of a barge having been built on a former ship's hull, plus a fair amount of freeboard and resulting "sail area" of the barge. On the other hand, if too much scope were put out, that extensive sail area of the cargo and free board would cause increased shearing.

Consequently, technically from the formula it appears that Martin's anchorage was at the shortest limit of being sufficient scope.

Contrasted with that finding, of course, is the effectiveness of the anchoring itself.

Before the court leaves the factors involved with the finding as to the length of chain: No one testified about seeing any chain markers on the anchor chain. Campbell claims they never got to the first chain marker because they never paid out a shot of chain, which would be 15 fathoms or 90 feet. Dahliden said there weren't any chain markers on the chain because it was so rusty and there simply were none on it. When one looks at the pictures of the anchor chain, one can almost conclude by that alone that Dahliden was correct.

Ferland, one of the eyewitnesses during the period between the anchorage and the grounding, expressed his opinion that he doubted one could see the paint markings. His quotation is instructive: "that they may have been there when it left the yard a hundred years ago."

## EFFECTIVENESS OF ANCHORING

The tug left the barge on Saturday evening, March 14th, at about 6:00 P.M. or 1800, and steamed back to Fort Lauderdale, Port Laudania. About noon on Saturday, Campbell had called Ferland and asked him to go immediately to the barge and act as a watchman. And there he was to prevent pilferage and pay out the anchor—let it out—if that became necessary. For this Ferland was to receive one hundred dollars a day; he interrupted his Saturday lunch and he and his wife sailed for the Bahamas. They cleared Customs at Cat Cay on Sunday morning and then arrived at Ocean Cay mid-morning on Sunday.

Ferland is fairly expressive on the witness stand. He obviously is still upset about what happened both with the barge and his conversation with Campbell and from his reactions on the stand you can tell he still feels the same way. He testified "As soon as I saw the barge I wasn't happy because I knew a front was coming in and the barge was not where Campbell had said it would be. He said it would be on the back side or the east side of the island." So he sailed back to Cat Cay and called Campbell. He told Campbell the job was off for two reasons:

One, the barge wasn't on the back side where Campbell had said.

And secondly, Marcona wasn't answering his calls on Channel 16, and Campbell had said Marcona would be available for consultation or assistance.

Ferland stayed on Cat Cay on Sunday night—it was dark when he got there—and he returned to Ocean Cay on Monday. The wind was from the southwest at 20 to 25 knots, with seas of five to eight feet. In fact, he lost some deck cargo sailing back to Ocean Cay.

When he called Campbell, Campbell's remark was "Why was the deal off? and he seemed surprised that I was concerned." Campbell then said, "Well, stay and wait on the opposite side of the island. Go over twice daily by rowboat to check it, and call Marcona if there are any problems." Ferland told Campbell Marcona didn't answer his frequency so Campbell indicated he would call Marcona about it.

Tuesday, the weather lightened so much with seas of about one foot that, as Ferland graphically describes it, he and his wife sailed out, fished and "they played on the beach of a little island nearby." He believes it was Brown's Cay, which is exactly where the barge went aground on Friday.

Wednesday, the wind picked up again. The wind had been gusting and as the "CYA log" maintained by Coburn and Townsend on Ocean Cay described it: on Sunday night there had been 35 knot winds. There was an anemometer with the wind reading in knots, not miles per hour. On Monday night it gusted to 50 knots and dredging was shut down at 0500. Then on Tuesday it dropped down very, very low, sufficient to permit Ferland's "playing on the ... island." It picked up again on Wednesday: 25 to 35 knots with southwest gusts of 47. The pattern in this area, as testified to, is that the wind is from the southwest and then out of the northwest when they reach their severest. Then on Thursday, the winds were 25 to 40 in gusts; and it picked up on Friday to 40 to 50 with gusts to 66. And what he doesn't say at that point is that the anemometer flew off at 66 knots (hurricane force, just over 75 miles per hour) which Campbell testified to because he was in the office when it happened on Friday, the 20th. Shortly after that the barge broke loose and went aground.

Back to the question of the effectiveness of the anchoring. The barge was holding on Sunday, according to Ferland; on Monday his comment was it was "riding out the blow nicely." The barge was holding, according to Campbell, until it broke free at 3:30 P.M. Friday. Consequently, the barge was holding for better than five, almost six days, before it broke free during the height of the storm *only* when the knots reached *hurricane force in March;* shortly thereafter it went aground on Brown's Cay south of Ocean Cay.

There was some testimony by Coburn that he thought the barge was drifting as early as Sunday. The court was impressed by the explanation of Captain Reid as to that opinion: with this pattern of wind shifting the barge would tend to be swinging in a semi-circle at least, and that would have appeared to someone as far away as Coburn—nearly a mile away—to be moving. Without having some fixed point to make his references from Coburn couldn't tell whether the barge was drifting or not. Reid's explanation makes sense to the court because the overwhelming testimony was that the barge was riding out the blow nicely. It rode out the blow Sunday through Thursday and finally broke free on Friday.

## ACTIONS OF MR. CAMPBELL AND TUG KAHUNA

Campbell arrived with the tug KAHUNA apparently on Wednesday night, and anchored on the east side of the island. Campbell first found out about the anchorage on the west side of the island when Martin had told him on Sunday, although it was not a very clear conversation but apparently about not anchoring it where they had planned. And then Sunday night Ferland told him, calling from Cat Cay; obviously, Ferland's still upset that Campbell was unconcerned about it. Casey said Campbell never complained that the barge was anchored improperly or anchored in the wrong place. And Coburn's testimony was that when Campbell got there Wednesday and they were talking about it, that Campbell appeared unconcerned and went to have a beer. Campbell is not a party to this action. Campbell did have enough concern that he set out posts on Thursday to check the bearings, but there is no testimony that the checking of the posts, and taking bearings on the barge, indicated that it was dragging anchor on Thursday or on Friday until it broke free. The court concludes the barge was not dragging anchor.

Campbell did order the KAHUNA to go in and they made a couple of passes at the barge on Thursday in an effort to hook onto it. The KAHUNA made the effort, but it was a little too rough to get somebody aboard the barge. Captain Reid's opinion was that the KAHUNA was some-

what craven about it, because it went off and "hid" on the east side of the island. The KAHUNA, also at Campbell's direction, tried to hook the anchor chain on Friday; after that, of course, the barge did break free and went aground.

Campbell also indicated that he had attempted to get Marcona to send their tug to the barge during the week before he arrived there on Wednesday evening. The tug, the only one Marcona had that was capable of handling the barge, was tied up and Marcona wouldn't send it; further, that he knew all of the other tugs in the area and there was none available except the KAHUNA but it couldn't leave Miami before Wednesday.

### SUMMARY OF FINDINGS

Each of the findings already made is a finding of the court unless a contrary finding is indicated, or it's a recitation of contrary or conflicting evidence that the court obviously did not accept. In summary, Powell Brothers took the barge in tow in Fort Pierce, towed it to Ocean Cay as directed. They asked Marcona where to anchor the tow, per Campbell's directions, and anchored it in the area indicated to them by Marcona. Campbell, as expressed in Ferland's comment, "acted as if he owned the barge." Maybe he was simply being an extremely good broker in servicing his customers; of course, Campbell is one of the principals of the bare boat charterer of the barge.

The scope came out to be exactly five to one, the one which the court finds is at the minimum side of the recommended and acceptable length of scope; it may well have been too short, at least on paper, considering the merchant ship hull of the barge, the aragonite bottom and the stockless anchor of the barge.

If the proof is in the pudding [2], the scope wasn't too short, because the barge went through very, very strong winds on Sunday evening, continuing into Monday and then again on Wednesday and Thursday and until 3:30 on Friday when it finally broke free and then went aground. It broke free *only*

when the wind reached hurricane force of 66 knots (or better—as the anemometer broke at 66). And the court is not unmindful of Captain Stow's estimate that the wind gauge on Marcona exaggerates when it gets over 45.

■ The evidence is that there is a probability of gale force winds in March of zero to one percent. Hurricane force is even less probable. And, of course, the court can take judicial notice, and does so, that the hurricane season does not begin in south Florida, and obviously also in Bahamian waters on the east side of the Gulfstream, until June 1st and it runs until November 15th. Consequently, the foreseeability or probability of a hurricane would be even less than that of a gale, and would have to be at the low end of the zero to one percent range.

So when Captain Martin left the barge, he left it at the instructions of his operations manager, whom he called immediately after anchoring the barge, and was told to come home and don't stand by the barge— and the operations manager said that was because Campbell did not want to pay them the money necessary for the tug to do so—plus, Campbell had announced he was sending over a watchman. The instructions to Martin were: "If you see the man coming over on the sailboat, raise him on the radio." Martin did not see the man in the sailboat who obviously was Ferland. Ferland was sent over by Campbell as the watchman and was to let out additional anchor chain if necessary and to remain with the barge until the KAHUNA arrived to take it in tow.

Unfortunately for all, KAHUNA was several days late and when it arrived there the seas had picked up to unanticipated force. KAHUNA made no intense effort to pick up the barge and may well have broken the anchor free. KAHUNA's actions of trying to lash on to the anchor chain of the barge appear to be the event that caused the barge to break free and go aground, because the anchor had held for

---

**2.** And it nearly always is, certainly in equity, and Admiralty "is purest equity."

five-plus days through very strong winds before then.

After the court made the foregoing findings from the bench at the close of the evidence, the court requested briefs as to conclusions to be made from the law, as applied to the findings.[3]

## CONCLUSIONS OF LAW

This court has admiralty and maritime jurisdiction over all parties and claims relevant to the case at bar pursuant to 28 U.S.C. § 1333 and 46 U.S.C.App. § 185.

Plaintiff, POWELL BROTHERS, INC., as the owner of the tug SEA HAWK, is seeking exoneration from any liability with respect to all claims being asserted against it by the claimants/defendants, HANNAH MARINE CORPORATION, DONALD C. HANNAH, SOCOCO, LTD., LA INTER-AMERICANA DE SEGUROS GENE-RALES, S.A., SEGUROS COLMENA, S.A., and UNDERWRITERS AT LLOYDS, and any and all claims which may be asserted against it by the defendants, DONALD CAMPBELL, BESSIE H. CAMPBELL and PORT EVERGLADES SHIP SALES AND CHARTERERS, INC. The court notes that the third party claim of defendants DONALD CAMPBELL and BESSIE H. CAMPBELL was dismissed by claimants at the trial.

■ In order to decide whether a vessel owner is entitled to limitation of liability, the Court is required to undertake a two-step analysis. Initially the court must determine what acts of negligence or conditions of unseaworthiness caused the accident. Then the court must determine whether the shipowner had knowledge of or privity with those same acts of negli-

gence or conditions of unseaworthiness. See, Farrell Lines v. Jones, 530 F.2d 7 (5th Cir.1976); Hercules Carriers, Inc. v. Claimant State of Florida, 768 F.2d 1558 (11th Cir.1985). Disposition of the case before the court rests upon a determination of what acts of negligence or conditions of unseaworthiness caused the grounding of the barge CHALMED I. Knowledge or privity of the shipowner is not at issue.

■ The parties contesting a limitation of liability have the initial burden of proving negligence or unseaworthiness which is a causative factor in a loss. Farrell Lines v. Jones, 530 F.2d at 10. The parties contesting limitation in the instant case have alleged that POWELL BROTHERS, INC. was negligent in several ways.

First, the parties contesting limitation contend that POWELL BROTHERS, INC. was negligent in hiring and supervising the captain and crew of the tug SEA HAWK. The court after hearing testimony regarding the qualifications of the captain and crew, however, determined that the crew's size was adequate and the qualifications of Captain Martin were sufficient, despite his lack of prior experience with a barge of this size. As was noted earlier, the hiring and supervision of the captain and crew of the tug SEA HAWK is not a critical factor in the case before the court.

Rather, the critical factor and the focus of the trial in this action was whether the SEA HAWK negligently anchored the barge CHALMED I.

■ This court recognizes that a tug cannot delegate responsibility for mooring its tow to another party who has no duty with respect to mooring the tow. United

---

**3.** The court sought assistance on certain questions, viz:

1. Is the unforeseeability of winds of this kind sufficient to absolve Powell Brothers of any liability for the grounding?

2. Does the responsibility of the tug SEA HAWK and therefore Powell Brothers terminate when Ferland arrives at the site under instruction of Campbell of Port Everglades, also clearly the principal and the bare boat charterer of the barge?

3. If the answer to the second question is no, does responsibility of Powell Brothers terminate

because of the failure of Campbell to get another tug there earlier?

4. If you answer number two about the responsibility no, does the responsibility of Powell Brothers terminate when the KAHUNA arrives?

5. Are the efforts of the KAHUNA to take the barge CHALMED #1 in tow on Thursday and Friday, alluding to the grappling of the anchor chain, inasmuch as the court must find that the anchor of the barge was holding until then, does that constitute an intervening force sufficient to remove the liability from Powell Brothers?

*States v. Powell Brothers Barge No. 128,* 249 F.Supp. 553 (S.D.Fla.1965). In the instant case, however, Captain Martin did not delegate the responsibility for mooring the CHALMED I. Rather, Captain Martin, as a guest of Marcona Industries, simply accepted the area chosen by Marcona for the anchorage. Captain Martin contacted Marcona's dispatcher pursuant to Donald Campbell's instructions and was informed that there was a ship in the channel leading to the east side of the island and that due to the size of the barge, it would be dangerous to bring it in through the channel. Accordingly, Captain Martin had little choice but to anchor the CHALMED I in the site designated by Marcona. However, Captain Martin must still anchor the barge in a non-negligent and a seaworthy manner.

The parties opposing a limitation of liability next contend that the anchoring of the CHALMED I itself was deficient.

■ Accordingly, for the findings and reasons set forth earlier this court concludes that the CHALMED I was properly anchored and that insufficient scope was not a cause of the grounding. Captain Martin anchored the barge with such reasonable care and maritime skill as prudent navigators employ in performing similar services. *See, Stevens v. The White City,* 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699 (1932); *Agrico Chemical Co. v. M/V Ben W. Martin,* 664 F.2d 85 (5th Cir.1981); *S.C. Loveland, Inc. v. East West Towing, Inc.,* 415 F.Supp. 596 (S.D.Fla.1976), *aff'd,* 608 F.2d 160 (5th Cir.1979). Although technically Captain Martin's anchorage was on the minimum end of the range of sufficient scope, the effectiveness of the anchoring indicates that Captain Martin was not negligent in anchoring the CHALMED I.

■ Finally, the parties opposing a limitation of liability argue that Captain Martin improperly left the barge anchored at Ocean Cay. They contend that Captain Martin should have stood by the CHALMED I until another vessel arrived to take her in tow. One of the few matters not disputed in the subject case, however, is that Donald Campbell, the barge's agent

and a principal of the charterers, specifically told Mr. Casey, the operations manager of Powell Brothers, that he did not want to incur the expense involved in having the SEA HAWK stand by the barge. Rather, Captain Martin was told to return to Port Everglades "light" after delivering the manifest and other documents for the barge and its cargo to Marcona personnel. Further, Mr. Campbell then retained the services of Thomas Ferland to take his sailboat over to Ocean Cay and watch over the barge until the tug KAHUNA arrived. One of Mr. Ferland's duties was to let out more chain if necessary.

A "tug has an absolute duty of exercising reasonable care of its tow while in its custody, of mooring or anchoring it in a proper moorage or anchorage, and, unless discharged of such duty (either by direct orders or by the circumstances involved), of standing by until the towage contract is fully performed." A. Parks, *The Law of Tug, Tow, & Pilotage,* 179–80 (2d ed. 1982). In the case before the court, the towage contract was fully performed when Captain Martin properly anchored the CHALMED I. Powell Brothers offered to have the SEA HAWK stand by until the KAHUNA arrived. Mr. Campbell, however, declined this offer due to the potential cost involved.

Should this court refuse to limit the liability of POWELL BROTHERS in the instant case, tug owners would be required to perform their services in like circumstances whether or not the barge charterer consented to pay for such services, and even when the charterer has another tug coming to take the tow on to its destination and, additionally, has sent yet another party to keep watch on the tow with orders to let out anchor chain if necessary. In this case, Mr. Campbell clearly did not want to incur the expense of having the "SEA HAWK" stand by the barge. Had the parties opposing exoneration of liability been willing to incur the expense of having a tug available to assist the barge should conditions necessitate, the catastrophe that gave rise to the case before the court would never have occurred.

Accordingly, this court finds that the towage contract was satisfactorily performed in the manner contemplated by the

parties to this action. In addition, the tug was relieved of any legal obligation following the barge being properly anchored by the direct orders of the charterers and by the circumstance of this case. Surely a finding that Powell Brothers' duty was not terminated under these circumstances would be a gross trampling of Admiralty Law's "purest equity." This court finds, therefore, that Powell Brothers was not negligent in leaving the barge anchored at Ocean Cay.

Additionally, even if this court were to presume that Captain Martin and, therefore, Powell Brothers were negligent in leaving the anchored barge unattended, several subsequent events occurred that indicate that Powell Brothers cannot be held responsible for the grounding of the CHALMED I.

At the conclusion of the trial in the instant case, the court requested that the parties address five questions regarding intervening force or transfer of responsibility from Captain Martin and Powell Brothers, Inc. All parties involved in the case before the court have submitted post-trial memoranda. This court makes the following Conclusions of Law in accordance with the legal issues presented by the relevant questions.

■ The first question posed by the court was whether the unforeseeability of winds of this force (66 knots) was sufficient to absolve Powell Brothers of any liability for the grounding? The court made several factual findings with regard to the unforeseeability of the severe winds encountered in the instant case. The court found that at the time of the grounding of the barge on Friday, March 20, 1981, the wind was gusting to 66 knots and that the probability of gale winds, let alone hurricane force winds, occurring during the time period in question is less than one percent. The court further found that the barge held anchor for almost six days following the anchor's being set by the SEA HAWK and that the anchor did not begin to drag until the winds reached at least hurricane force.

■ If natural forces were foreseen or reasonably might have been foreseen by a negligent party, he may be held liable for any harm, which could have been avoided by the exercise of reasonable care. *The Mariner, Jacobson v. Suderman & Young, Inc.,* 17 F.2d 253 (5th Cir.1927); *Cachick v. United States,* 161 F.Supp. 15 (S.D.Ill.1958); *Benedict Pineapple Co. v. Atlantic Coast Line R. Co.,* 55 Fla. 514, 46 So. 732 (1908). In the instant case, however, the natural force, winds of hurricane strength, was not foreseen by the tug SEA HAWK. In addition, with the probability of such winds occurring being closer to zero than to one percent, it is not reasonable to conclude that the captain of the SEA HAWK should have anticipated the event.

■ The burden of proving an act of God rests heavily upon the party asserting such a defense, and the party must show that the accident could not have been prevented by human skill and precaution. *Kansas City Southern Railway Company v. Barge HBC 8106,* 642 F.Supp. 609 (W.D. La.1986). The court is not convinced that Powell Brothers has sufficiently sustained the burden of proving that the accident was solely as a result of an act of God. The court notes, however, that the improbable and unanticipated hurricane force winds constitute one more factor militating against the responsibility of Powell Brothers for the subject grounding.

Additionally, the court notes that the improbable weather conditions occurred more than five days after the CHALMED I was anchored in the location selected by Marcona. "Although, generally speaking, the tug captain impliedly represents that the berth is a safe one under existing and reasonably anticipated conditions, he does not represent it remaining safe for an indefinite period of time." *Gulf Oil v. Tug Gulf Explorer,* 337 F.Supp. 709 (E.D.La. 1971), *aff'd,* 472 F.2d 1406 (5th Cir.1973); *L.R. Connett & Co., Inc. v. The Republic No. 5,* 43 F.Supp. 245 (S.D.N.Y.1941).

The second inquiry established by the court was whether the responsibility of the tug SEA HAWK and Powell Brothers terminated when Thomas Ferland arrived at Ocean Cay pursuant to the instructions of Donald Campbell. Mr. Campbell hired Mr. Ferland, at a cost of $100.00 per day, to act

as a watchman for the barge to prevent pilferage, to let out more anchor chain if necessary, and to remain with the CHALMED I until the relief tug KAHUNA arrived.

Mr. Ferland testified at trial that he boarded the CHALMED I on Sunday and determined that the scope of chain was adequate even though winds were strong. He did not, therefore, let out any more anchor chain. Mr. Ferland, unlike the consignee in *Triboro Scow Corporation v. M.F. Hickey Co.*, 280 F.2d 308 (2d Cir. 1960), *cert denied*, 365 U.S. 802, 81 S.Ct. 467, 5 L.Ed.2d 460 (1961), did not take "such steps as were reasonable and feasible to try to remedy the situation presented to it" by the tug. *Triboro Scow*, 280 F.2d at 310. Mr. Ferland had ample opportunity to let out more scope on the anchor chain but did not do so, mainly because it was not necessary then, in strong winds and a day after the barge was anchored. Since the only possible lack of care that the court finds that may be attributed to the tug is using the least permissible scope, Mr. Ferland could have quite easily "remedied the situation presented." 280 F.2d at 310.

■ The third inquiry presented by the court is whether the responsibility of Powell Brothers was terminated due to the failure of Campbell to get another tug there earlier. Mr. Campbell was aware of the location where the CHALMED I was anchored as early as March 15, 1981. At that time the SEA HAWK was available to return to Ocean Cay and stand by the barge if requested to do so. No such request was made. Rather, Mr. Campbell signed off on the work order pertaining to the SEA HAWK and discharged the SEA HAWK from any further obligations.

Mr. Campbell chose to delegate responsibility for the tug to his agent, Thomas Ferland, and to the relief tug KAHUNA. The SEA HAWK had the right to assume that they were relieved of responsibility and that the watchman, Mr. Ferland, and the relief tug, KAHUNA, would, in all respects, properly attend to the barge while it was in their care and control. *Gulf Oil Corporation v. Tug Gulf Explorer*, 337 F.Supp. 709 (E.D.La.1971), *aff'd*, 472 F.2d 1406 (5th Cir.1973); *Powell & Minnock*

*Brick Works Inc. v. Callahan Rd. Imp. Col*, 210 F.Supp. 114 (S.D.N.Y.1962).

■ The fourth and fifth questions posed by this court are whether the responsibility of Powell Brothers terminated when the KAHUNA arrived and whether the efforts of the KAHUNA to take the CHALMED I in tow on Thursday and Friday constitute an intervening force to remove the liability from Powell Brothers. The court determined that the KAHUNA grappled the anchor chain of the CHALMED I and subsequent to the grappling, the barge broke free and ran aground.

This court concluded that the actions of the KAHUNA in trying to lash on to the anchor chain of the barge appears to be the event—at least, in conjunction with hurricane-force winds—that caused the barge to break free and go aground. Of course, KAHUNA's attempts to lash onto the anchor chain may also have had no effect. As was noted by the Eleventh Circuit Court of Appeals, "to produce liability, the acts of unseaworthiness must be a contributory and proximate cause of the accident." *Hercules Carriers, Inc. v. Claimant State of Florida*, 768 F.2d 1558, 1566 (11th Cir. 1985) (citing *Board of Commissioners of the Port of New Orleans v. M/V farmsum*, 574 F.2d 289 (5th Cir.1978). This court finds that Powell Brothers cannot be held liable in the instant case due to the fact that even assuming that the tug SEA HAWK was initially negligent, this negligence would not be the proximate cause of the barge CHALMED I breaking free from its anchorage.

The court is fully cognizant of the high burden placed upon the tug and towing party in situations like this, but the tug is not an absolute insurer. Under all the circumstances presented in this case, especially in view of the actions of the broker and a principal of the charterer in declining to have the tug stand by and in sending over a sentinel instead, to rule in favor of the barge and Defendants would give the barge a "heads I win, tails you lose" advantage in similar towing circumstances.

In conclusion, this court finds that the responsibility of the tug SEA HAWK was

terminated once the CHALMED I was safely anchored at the completion of the voyage. *Daniels Towing Service, Inc. v. Nat Harrison Associates, Inc.*, 303 F.Supp. 1065 (S.D.Fla.1969); *United States v. Powell Brothers Barge No. 128*, 249 F.Supp. 553 (D.C.Fla.1965). In addition, the tug SEA HAWK "did not have exclusive control over its tow but only such control as was necessary to enable the tug to fulfill the towage engagement." *Gulf Oil Corporation v. Tug Gulf Explorer*, 337 F.Supp. 709 (E.D.La.1971). Finally, even if this court were to assume that the tug "SEA HAWK" were negligent in some manner, said negligence would not constitute the proximate cause of the grounding at issue. Accordingly, it is

ORDERED AND ADJUDGED that the petition of Powell Brothers, Inc. for exoneration or limitation of liability is GRANTED.

DONE AND ORDERED.